Versión para imprimir



EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| William Blassini Cabassa, et als<br><br>Recurridos<br><br>v.<br><br>Departamento de Recursos Naturales y Ambientales<br><br>Peticionario | Certiorari<br><br>2009 TSPR 127<br><br>176 DPR ____ |

Número del Caso: CC-2007-1104

Fecha: 7 de agosto de 2009

Tribunal de Apelaciones:

> Región Judicial de San Juan
> Panel I

Juez Ponente:

> Hon. Erik Ramírez Nazario

Oficina del Procurador General:

> Lcda. Isabel Sánchez del Campo

Abogado de la Parte Recurrida:

> Lcdo. Oscar Acarón Montalvo

Materia: Revisión sobre los boletos de vida silvestre

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

William Blassini Cabassa, et
als

       Recurridos

         v.

Departamento de Recursos
Naturales y Ambientales

       Peticionario

CC-2007-1104

Opinión del Tribunal emitida por el Juez Asociado Señor Rivera Pérez.

San Juan, Puerto Rico, a 7 de agosto de 2009.

Por medio del presente recurso de *certiorari*, se nos solicita que revisemos una Sentencia emitida por el Tribunal de Apelaciones, la cual revoca una Resolución dictada por el Departamento de Recursos Naturales y Ambientales, en adelante DRNA. El foro apelativo intermedio resolvió que la intervención efectuada por el Cuerpo de Vigilantes del DRNA no cumplió con los requisitos estatutarios ni jurisprudenciales sobre los registros y allanamientos, por cuya razón declaró irrazonable la intervención por ser de naturaleza inconstitucional.

I

El 5 de septiembre de 2005, el Sr. William Blassini Cabassa, el Sr. Roberto Matías Borreli y el Sr. Noel Matías Santiago, en adelante los recurridos, se encontraban cazando tórtolas en una finca privada propiedad del Sr. Raynier Ramírez, sitia en el sector Rayo Plata del Barrio Encarnación del municipio de Lajas. Por ser temporada de caza y en una zona donde se permite tal actividad, el Cuerpo de Vigilantes del DRNA, en adelante Vigilantes, se encontraba en el área vigilando el cumplimiento de las leyes y reglamentos que regulan el deporte de la cacería en Puerto Rico. Los Vigilantes, alegaron escuchar detonaciones de armas de fuego y entendieron que tenían motivos fundados para penetrar en la finca privada propiedad del señor Raynier Ramírez de donde supuestamente provenían los disparos. **Para lograr acceso a la finca, el Sr. Fabre les permitió la entrada a su finca colindante con la propiedad inmueble donde se oyeron los disparos y cortó una verja de alambres que marcaba la colindancia entre su finca y la del señor Raynier Ramírez, donde se encontraban los cazadores practicando su deporte.**

En la finca del señor Raynier Ramírez, los Vigilantes, utilizaron cuatro (4) vehículos de motor y se dividieron en dos (2) grupos. Cuando los Vigilantes se encuentran con los

recurridos, ya en su campamento y no cazando, procedieron a intervenir con estos expidiéndoles multas por violaciones a la Ley de Vida Silvestre y al Reglamento para Regir la Conservación y el Manejo de la Vida Silvestre, las Especies Exóticas y la Caza en Puerto Rico.[1]

A los recurridos se les multó por cazar aves en exceso a lo permitido por ley y cazar en un área cebada. En adición, al señor Blassini Cabassa se le multó por prestar un arma de fuego inscrita para la cacería a una persona que no tenía una licencia para cazar expedida por el Estado. Por ello, se les multó por la cantidad de $1,800 y $500 respectivamente. **La intervención, según reconoce el DRNA, se realizó en propiedad privada y sin previa orden judicial**.

Insatisfechos con el procedimiento seguido por los Vigilantes, antes y durante la intervención, los recurridos solicitaron una revisión de las multas administrativas. En suma, alegaron que la evidencia obtenida por los Vigilantes es inadmisible por ser producto de un registro irrazonable e inconstitucional.

Luego de varios trámites procesales administrativos, el 16 de junio de 2006, el Oficial Examinador emitió un informe determinando que el registro efectuado por los Vigilantes era razonable y legal. Recomendó que se mantuvieran las multas en cuanto a cazar en exceso a lo permitido por ley y en área cebada, mas no así la multa

---

[1] 12 L.P.R.A. § 107 *et seq.*; Reglamento del Departamento de Recursos Naturales Núm. 6765, aprobado el 10 de febrero de 2004.

impuesta al señor Blassini Cabassa por prestar el arma de fuego a una persona sin autorización para cazar en Puerto Rico.

El 22 de junio de 2006, el DRNA dictó una Resolución acogiendo las recomendaciones contenidas en el informe del Oficial Examinador y confirmando las multas sugeridas.[2] En esta Resolución, **el DRNA concluyó que el registro realizado por los Vigilantes no fue ilegal por estar contemplado en el Artículo 5B (1) de la Ley de Vigilantes de Recursos Naturales;[3] la Sección 6.1 de la Ley de Procedimiento Administrativo Uniforme, en adelante LPAU;[4] y la jurisprudencia establecida en el caso de *Pueblo v. Ferreira Morales*.**[5] Ante esta situación, los recurridos presentaron una solicitud de reconsideración, la cual fue declarada NO HA LUGAR.

Inconformes, los aquí recurridos, acudieron ante el Tribunal de Apelaciones solicitando la revocación de la Resolución emitida por el DRNA. El foro apelativo intermedio acogió los planteamientos de los aquí recurridos y revocó. Ello, por entender que la intervención fue producto de un registro ilegal e inconstitucional. El Tribunal de Apelaciones dictaminó que la caza deportiva no es una actividad estrechamente regulada por el Estado, por

---

[2] Aunque el DRNA denomina la Resolución como parcial concluimos que la misma es final por no quedar otro asunto por resolver.

[3] 12 L.P.R.A. § 1205 (b) (1).

[4] 3 L.P.R.A. § 2191.

[5] 147 D.P.R. 238 (1998).

tanto, los Vigilantes necesitaban una orden judicial para penetrar en la finca privada donde se encontraban los cazadores aquí recurridos. Además, concluyó que el DRNA no podía realizar un registro sin orden judicial al amparo de su facultad de otorgar licencias según dispone la LPAU, ya que dicha excepción solo se extiende a actividades comerciales. El Tribunal de Apelaciones ordenó la supresión de la evidencia obtenida mediante el registro, la cual sirvió de base para la imposición de las referidas multas administrativas.

Inconforme con la determinación del Tribunal de Apelaciones, el DRNA acude ante nos solicitando la revisión de dicha Sentencia. El peticionario señaló como error incurrido por el Tribunal de Apelaciones lo siguiente:

> **Erró el Tribunal de Apelaciones al determinar que el registro efectuado por el Cuerpo de Vigilantes del DRNA en la finca privada donde los recurridos cazaban fue inconstitucional por haberse practicado sin motivos fundados, sin orden judicial y en ausencia de excepción alguna que permitiera tal intervención.**

## II

La LPAU establece una norma de revisión judicial que le imparte deferencia a las resoluciones emitidas por las agencias administrativas. Tal deferencia se observa por el conocimiento especializado que las agencias administrativas poseen en las áreas que estas regulan, siempre y cuando sus

decisiones finales estén basadas en evidencia sustancial que obre en la totalidad del expediente administrativo.[6]

Por otro lado, **la LPAU establece que las conclusiones de derecho serán revisables en todos sus aspectos por los tribunales.**[7] Esta norma obedece a que los tribunales como conocedores del Derecho no tienen que dar deferencia a las interpretaciones jurídicas que sobre el Derecho en general realizan las agencias administrativas.[8] No obstante, hemos establecido que se le debe impartir deferencia a la interpretación especializada de las agencias administrativas sobre las leyes y reglamentos que estas administran. Por ello, no se puede descartar de forma liberal tales interpretaciones.[9]

Ahora bien, en el presente caso no existe tal situación porque no está envuelta una situación de alta complejidad técnica que requiera el conocimiento especializado de la agencia para resolverlo. En otras palabras, la deferencia que los tribunales deben darle a

---

[6] 3 L.P.R.A. § 2175; *Hernández v. Centro Unido de Detallistas*, 168 D.P.R._, 2006 T.S.P.R. 131; *Otero v. Toyota*, 163 D.P.R. 716, 728 (2005); *Metropolitana S.E. v. ARPE*, 138 D.P.R. 200, 213 (1995); *Gallardo v. Clavel*, 131 D.P.R. 275, 290 (1992); *Murphy Bernabé v. Tribunal Superior*, 103 D.P.R. 692, 699 (1975).

[7] 3 L.P.R.A. § 2175; *Hernández v. Centro Unido de Detallistas*, 165 D.P.R. 582 (2005); *Martínez Segarra v. Rosado Santoni*, *supra*; *Misión Industrial v. Junta de Planificación*, 146 D.P.R. 64, 132 (1998).

[8] *San Antonio Maritime v. Puerto Rican Cement*, 153 D.P.R. 374, 397 (2001).

[9] *Cruz Negrón v. Administración de Corrección*, 164 D.P.R. 341, 357 (2005); *Martínez Segarra v. Rosado Santoni*, *supra*; *Misión Industrial v. Junta de Planificación*, *supra*.

las resoluciones administrativas por su grado de especialidad en la materia, no está aquí presente. Solo hay que interpretar en esta ocasión, el Derecho en general y para ello ningún foro está más capacitado que un tribunal.

                              III

Antes de proceder a resolver la controversia de marras, analizaremos cómo el derecho de intimidad en Puerto Rico, en lo pertinente, protege a las personas en contra de registros y allanamientos sin previa orden judicial. El Artículo dos (II) sección diez (10) de la Constitución de Puerto Rico[10] dispone, en parte, lo siguiente:

> No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.
>                     . . .
> Solo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.
> Evidencia obtenida en violación de esta sección será inadmisible en los tribunales.

Conforme a dicha disposición constitucional, todo registro, allanamiento o incautación realizada sin orden judicial previa se presume irrazonable.[11] Esta norma está

---

[10] 1 L.P.R.A. Art. II § 10.

[11] *Pueblo v. Narváez Cruz*, 121 D.P.R. 429, 436 (1988).

sujeta a "contadas excepciones de alcance rigurosamente definido".[12]

La Constitución de Puerto Rico se extiende a todo tipo de registro, sean estos civiles, administrativos o penales. Significa que cualquier registro, no importa su naturaleza, se presumirá controvertiblemente irrazonable de llevarse a cabo sin previa orden judicial.[13]

**Cuando hablamos de inspecciones administrativas, nos referimos al registro a través de la presencia física de un funcionario administrativo en la propiedad privada de una persona natural o jurídica que se dedica a una actividad o negocio** reglamentado por el Estado. En estos casos, la expectativa razonable de intimidad de la persona podría ser intervenida. Está presente un choque entre el derecho a la intimidad y el interés de la agencia en obtener la información necesaria para poder fiscalizar el cumplimiento de las leyes y sus reglamentos administrativos. En una situación de esa naturaleza la inspección a realizarse por el Estado está limitada por la protección constitucional contra registros y allanamientos irrazonables, contenida en el Artículo dos (II), Sección diez (10) de la Constitución de Puerto Rico, *supra*.

**Es preciso mencionar que nuestra Constitución, *supra*, reconoce y concede unos derechos más abarcadores que los derechos contenidos en la Constitución de Estados Unidos**

---

[12] *Íd.*

[13] *H.M.C.A. v. Contralor*, 133 D.P.R. 945, 974 (1993); *Pueblo v. Ramos Santos*, 132 D.P.R. 363, 370 (1992); *Pueblo v. Rivera Colón*, 128 D.P.R. 672 (1991); *E.L.A. v. Coca Cola*, 115 D.P.R. 197 (1984).

**de América, particularmente en lo relativo al derecho de intimidad, entre otros.**[14] Al demarcar los contornos de las garantías y derechos garantizados por la Constitución de Puerto Rico sobre este asunto, al igual que los estados de la Unión, podemos ser más amplios y abarcadores que el Tribunal Supremo de Estados Unidos en su interpretación de la cláusula análoga de la Constitución Federal.[15] Ello, pues la Cuarta Enmienda de la Constitución de los Estados Unidos de América, según interpretada por el Tribunal Supremo Federal, constituye la protección mínima que los estados están obligados a reconocer.[16]

La Sección diez (10) del Artículo dos (II) de la Constitución de Puerto Rico, *supra*, está íntimamente relacionada con las secciones primera (1) y octava (8) del mismo Artículo.[17] La Sección 1 consagra la inviolabilidad de la dignidad e igualdad del ser humano, mientras que la Sección 8 protege a las personas de ataques abusivos a su honra, a su reputación y a su vida privada o familiar. Estos principios son consustanciales con el derecho de intimidad.[18]

Los tres objetivos históricos que persigue la referida garantía constitucional contra registros irrazonables son:

---

[14] *H.M.C.A. v. Contralor*, *supra*; *Pueblo v. Rivera Colón*, *supra*.

[15] *H.M.C.A. v. Contralor*, *supra*.

[16] *Rullán v. Fas Alzamora*, 166 D.P.R. 742, 771 (2006).

[17] 1 L.P.R.A. Art. II §§ 1, 8.

[18] *Rullán v. Fas Alzamora*, *supra*, en las págs. 770-771.

proteger la intimidad y dignidad de los seres humanos, amparar sus documentos y otras pertenencias, e interponer la figura de un juez entre los funcionarios públicos de las Ramas Ejecutiva y Legislativa y la ciudadanía para ofrecer mayor garantía de razonabilidad a la intervención con el derecho a la intimidad del ciudadano.[19]

Sin embargo, el hecho de que el Estado intervenga con un ciudadano no activa *per se* la referida protección constitucional. Más bien, para que dicha protección se active, es necesario determinar si el individuo tiene un interés personal sobre el lugar u objeto registrado, de modo que posea una expectativa razonable de intimidad.[20]

Para determinar si una persona posee una expectativa razonable de intimidad en el tiempo y lugar en que se efectuó el registro se consideran los siguientes factores: (1) lugar registrado; (2) naturaleza y grado de la intrusión; (3) objetivo o propósito de la intervención; (4) si la conducta de la persona indicaba alguna expectativa subjetiva de intimidad; (5) la existencia de barreras físicas que restrinjan la entrada o visibilidad al lugar; (6) la cantidad de personas que tienen acceso legítimo al lugar (7) las inhibiciones sociales relacionadas con el lugar registrado;[21] (8) y el momento en que se realiza el registro.

---

[19] *Íd*. en la pág. 772.

[20] *Íd*.

[21] *Pueblo v. Rivera Colón*, *supra*.

A pesar de la norma general estableciendo que cualquier registro realizado sin una orden judicial constituye *prima facie* un registro ilegal,[22] existen excepciones al requerimiento de previa orden judicial en los registros y allanamientos. La LPAU incorporó algunas de las excepciones sobre registros y allanamientos disponiendo lo siguiente:

> [L]as agencias podrán realizar inspecciones para asegurarse del cumplimiento de las leyes y reglamentos que administran y de las resoluciones, ordenes y autorizaciones que expiden, sin previa orden de registros y allanamientos, en los siguientes casos: **(a) en casos de emergencias, o que afecte la seguridad o salud pública; (b) al amparo de la facultades de licenciamiento, concesiones de franquicias, permisos u otros similares; (c) en caso en que la información es obtenible a simple vista o en sitios públicos por mera observación.**[23]

**La Legislatura reconoció en la LPAU que en Puerto Rico todo registro sin orden judicial se presume irrazonable. De otra forma se podría colocar en peligro de invalidez el estatuto por entrar en conflicto con derechos protegidos por la Constitución de Puerto Rico, *supra*.**[24] La razonabilidad del registro o allanamiento efectuado sin previa orden judicial depende de la totalidad de las circunstancias.

Sobre la facultad administrativa de licenciamiento de ciertas agencias administrativas, **es indispensable aclarar**

---

[22] *Pueblo v. Dolce*, 105 D.P.R. 170 (1976).

[23] 3 L.P.R.A. § 2191.

[24] Véase, *H.M.C.A. v. Contralor*, *supra*; *E.L.A. v. Coca Cola*, *supra*.

**que la mera otorgación de una licencia no convierte *ipso***

***facto* al negocio o actividad en una íntimamente**

**reglamentada o relacionada con la salud y/o seguridad**

**pública. Lo determinante debe ser la naturaleza del**

**comercio o actividad, no el que se le requiera un permiso o**

**licencia para operar o ejercer.**[25]

En *Pueblo v. Ferreira*, *supra*, establecimos que la razonabilidad de un registro en una industria íntimamente reglamentada depende de que se cumplan con los requisitos siguientes: existencia de un interés sustancial que fundamente el esquema regulador de la agencia que realiza el registro administrativo; si el esquema regulador del comercio o actividad realizada adelanta el interés del Estado; y si el esquema regulador contiene suficientes garantías en cuanto a la certeza y regularidad de los registros, de forma tal que constituya un sustituto adecuado al requisito constitucional de previa orden judicial. Expresamos lo siguiente:

> Estimamos que las garantías en cuanto a certeza y regularidad de un estatuto que autoriza a una agencia administrativa a realizar registros administrativos en negocios estrechamente reglamentados quedan satisfechos bajo la Sección 10 de nuestra Carta de Derechos si se satisfacen, al menos, los siguientes elementos: **(1) el estatuto advierte al propietario. . .que su negocio está sujeto a inspecciones no discrecionales por parte de funcionarios públicos al amparo de una ley; (2) el estatuto establece el alcance de la inspección y notifica a su propietario quienes están autorizados para realizarlo; y (3) el tiempo, lugar y alcance de la inspección está limitado adecuadamente.**[26]

---

[25] *Pueblo v. Ferreira Morales*, *supra*, en la pág. 256.

[26] *Íd.* en la pág. 263.

Un sustituto adecuado en esos casos puede ser indicarles a las personas naturales o jurídicas sujetos de un registro administrativo sobre la certeza y regularidad de las inspecciones administrativas **y delimitar el ámbito discrecional del funcionario que realiza tal investigación o registro.**

Este Tribunal ha reconocido, como excepción a la regla general, el registro consentido válidamente.[27] Para que el consentimiento prestado sea válido, se requiere que el mismo sea voluntario y que sea prestado por quien tenga autoridad para concederlo. En este sentido, hemos resuelto que si el consentimiento es dado por un tercero se requiere que la persona tenga "una autoridad común u otra relación suficiente con respecto a la propiedad a ser registrada".[28] Por ello, un tercero no puede prestar un consentimiento válido para registrar una propiedad que ésta bajo la posesión exclusiva de otro.[29] Esta norma fue reiterada en *Pueblo v. Rivera Colón*, *supra*, donde resolvimos que un tercero no estaba autorizado para consentir la entrada de los agentes del orden público a la propiedad de otra persona.

Cuando los Agentes del orden público -así como los Vigilantes- no tengan información previa sobre la autoridad de una persona para consentir a un registro, estos deberán

---

[27] *Pueblo v. Narváez Cruz*, *supra*, en las págs. 436-37.

[28] *Íd*. en la pág. 691.

[29] *Íd*.

indagar al respecto al momento de solicitar el consentimiento, pedirle a la persona que se identifique y preguntarle si es la dueña del lugar o la relación que tiene con el mismo.[30] A base de la totalidad de las circunstancias se determinará si la persona que prestó el consentimiento tenía la capacidad requerida para autorizar el registro.[31]

IV

La Constitución de Puerto Rico dispone que será política pública de nuestro gobierno "la más eficaz conservación de sus recursos naturales, así como el mayor aprovechamiento de los mismos para el beneficio general de la comunidad".[32] A tenor con este mandato constitucional se aprobó la Ley de Vida Silvestre, *supra*, así como el Reglamento para Regir la Conservación y el Manejo de la Vida Silvestre, las Especies Exóticas y la Caza en Puerto Rico, *supra*, en adelante Reglamento.[33] Algunas de las

---

[30] *Pueblo v. Narváez Cruz*, *supra*, en la pág. 443.

[31] *Pueblo v. Miranda Alvarado*, 143 D.P.R. 356 (1997).

[32] 1 L.P.R.A. Art. VI § 19.

[33] No estamos en posición de concluir que el deporte de la cacería afecta nuestros recursos naturales. Por el contrario tal deporte controla ciertas especies cuya propagación desmedida puede resultar dañina para la salud de la ciudadanía. Ejemplo de esto son las enfermedades que pueden causar ciertas aves, como: histoplasmosis, candidiasis, cryptococcosis, encefalitis St. Louis y salmonella, entre otras. Por lo que se permite la exterminación de palomas en lugares donde estas se han convertido en una plaga durante todo el año, siempre y cuando sean exterminadas por profesionales licenciados. Para más información, véase: www.aphis.usda.gov; www.osha.gov, al 16 de julio de 2009.

facultades investigativas de los Vigilantes sobre los cazadores son las siguientes:

> [I]nspección del producto diario de su caza y su licencia de caza deportiva a funcionarios (empleados) del Departamento debidamente autorizados e identificados, funcionarios del orden público o un cazador autorizado. Cualquier especie de fauna silvestre cazada en violación a este Reglamento, así como las armas, balas, cartuchos, municiones, arcos, flechas, cualquier embarcación, vehículo o cualquier aparato que haya sido utilizado en violación a este Reglamento podrán ser retenidas e incautadas por miembros del Departamento debidamente autorizados, miembros del Cuerpo de Vigilantes y/o de la Policía de Puerto Rico.[34]

La disposición anterior faculta a los Vigilantes a intervenir con los cazadores quienes están compelidos a cumplir con las leyes y reglamentos que regulan el deporte de la caza en Puerto Rico. Para fortalecer y facilitar la autoridad de los Vigilantes sobre los cazadores **así como prevenir que los cazadores induzcan a error a los Vigilantes sobre la cantidad de aves cazadas**, el Reglamento dispone que, "[n]inguna persona podrá desplumar completamente un ave en el área de caza. Por lo menos, la cabeza y una de las alas, deben permanecer con todas las plumas adheridas al ave, cuando sea transportada del área de caza a su residencia".[35]

De lo expuesto, no surge duda alguna de que los Vigilantes tienen autoridad en ley para intervenir con los cazadores y este Tribunal no pretende limitar en lo

---

[34] *Supra* n. 1, en el Art. 5.06 B.

[35] Reglamento del DRNA núm. 6765, en el Art. 5.09 C.

absoluto tal facultad investigativa del DRNA. Lo que si entendemos pertinente es que se reconozca que los Vigilantes tienen unas limitaciones constitucionales, estatutarias y reglamentarias que no pueden obviar o ignorar. El Reglamento prohíbe taxativamente cazar en fincas privadas sin el consentimiento del dueño y dispone que, **"[e]l cazador deberá proveer información sobre el nombre, número de teléfono y lugar donde se puede contactar al dueño, administrador o encargado que le autorizó, de manera que esta autorización pueda ser corroborada posteriormente"**. Dicha disposición reglamentaria pretende confirmar la autorización del dueño de la finca para la práctica de la caza en su propiedad.

Otra limitación impuesta por el mismo Reglamento se encuentra en la regulación de la caza en áreas cebadas. El Reglamento dispone que el DRNA colocará rótulos en las áreas que han sido cebadas. En tal situación, **el Reglamento establece que los Vigilantes tratarán de conseguir al dueño de la finca para solicitarle autorización para colocar los rótulos; del dueño negarse, es responsable de prohibir la caza en su propiedad.** En adición a lo reseñado, **la Ley del Cuerpo de Vigilantes del DRNA,** *supra*, **estatuye que "la entrada en propiedades privadas requiere el permiso previo del dueño del terreno, excepto en los casos que establece la sec. 2191 del Título 3, parte de la Ley de Procedimiento Administrativo Uniforme".**[36] Todas las disposiciones reglamentarias y estatutarias expuestas consideran

---

[36] 12 L.P.R.A. § 1205.

situaciones específicas dentro de propiedades privadas y fueron incluidas para salvar la constitucionalidad del Reglamento.

V

Establecidos los parámetros de la autoridad de los Vigilantes para velar por el fiel cumplimiento de las regulaciones del deporte de la cacería en propiedad privada, examinaremos si en el caso de autos aplica alguna de las excepciones reconocidas en la LPAU. Recordemos que el alegado motivo fundado para creer que se estaba cometiendo un delito o una posible violación reglamentaria en la finca privada propiedad del señor Raynier Ramírez fue haber escuchado unas detonaciones de armas de fuego en plena temporada de cacería provenientes de esa propiedad ubicada en una zona autorizada para practicar tal deporte.

Los Vigilantes no pueden intervenir con los cazadores en cualquier tiempo o lugar. Para ello, **deben cumplir con el requisito de tener derecho previo a estar en el lugar donde intervienen con los cazadores**. Por ello, resulta ineludible evaluar si los Vigilantes tenían el derecho previo de estar en el lugar donde realizaron la intervención; entiéndase, dentro de la finca propiedad del señor Raynier Ramírez.

**La finca propiedad del señor Raynier Ramírez se encontraba cercada lo que impedía el acceso de las personas y de los vehículos. Por ello, la verja es una señal o indicio claro de que existía una expectativa razonable de intimidad.**

Del expediente ante nos, no se desprende que el colindante, señor Fabre contara con la autoridad del dueño de la finca intervenida, requerida por nuestro ordenamiento jurídico para permitir el acceso de los Vigilantes a esa propiedad. De igual forma, tampoco refleja que los Vigilantes cumplieron con el requisito de indagar sobre la autoridad del señor Fabre para permitirles penetrar en una finca que no es de su propiedad. Por lo expuesto, concluimos que el consentimiento prestado por el señor Fabre no cumple con los requisitos establecidos para su validez.[37]

**El señor Fabre recurrió a la fuerza al cortar la verja colindante, permitiendo así que los Vigilantes penetraran en la finca del señor Raynier Ramírez.** Esta Curia ha expresado en varias ocasiones que no se justifica una investigación administrativa en la cual se hace uso de la fuerza.[38] En *H.M.C.A. v. Contralor*, *supra*, reseñamos que, **"el uso de la fuerza para realizar un registro solo procede cuando se ha obtenido una orden de allanamiento, aún cuando el legislador haya autorizado los registros sin orden y se trate de una industria extensamente reglamentada. . .".**

---

[37] Aunque el señor Fabre haya construido la verja colindante, ello no le da la potestad para permitir la entrada de los Vigilantes a una finca privada que no es de su propiedad y cuyo acceso estaba impedido por dicha verja. Además, tampoco es indicio de que éste sea el único propietario de la verja colindante. Muestra de ello es que en la verja existía un portón con candado que daba acceso a la finca del señor Raynier Ramírez del cual el señor Fabre poseía una llave, pero el señor Raynier Ramírez cambió ese candado y no le dió llave del nuevo candado al señor Fabre.

[38] *E.L.A. v. Coca Cola*, *supra*.

En cuanto a la concesión de licencias y la jurisprudencia establecida en el caso de *Pueblo v. Ferreira*, *supra*, hemos expresado que la mera concesión por el Estado de una licencia no convierte *per se* el negocio o industria para la cual se concede en una estrechamente reglamentada. En el presente caso, no nos encontramos con una actividad de industria o comercio, sino como lo define la Ley de Vida Silvestre y el Reglamento, ante una **actividad recreativa.**[39]

¿Constituyó motivo fundado para los Vigilantes del DRNA creer que se estaba cometiendo un delito o una violación al reglamento de esa agencia al escuchar detonaciones de armas de fuego en una finca privada rural en un área donde se permite practicar el deporte de la cacería y en plena temporada de caza? Contestamos esta interrogante en la negativa. Veamos. Era temporada y un área donde se permite la cacería, los Vigilantes penetraron en una finca privada sin previa orden judicial; no habían recibido ningún tipo de confidencia de que se estuviera incurriendo en alguna actividad ilegal en la propiedad; no contaban con el consentimiento del dueño de la finca intervenida; los Vigilantes logran el acceso a la finca a través de una finca colindante, luego de que el señor Fabre, dueño de la misma, sin autorización del dueño de la

---

[39] 12 L.P.R.A. § 107 (d); la **Ley de Vida Silvestre y el Reglamento definen caza deportiva como una "actividad recreativa** autorizada por el Secretario en la cual el participante, llamado cazador deportivo, utiliza un arma para hacer presa un animal de caza durante las temporadas establecidas por el Secretario".

finca intervenida cortara la verja; y no se podía observar a los cazadores desde la carretera donde los Vigilantes supuestamente escucharon las detonaciones. Concluimos que los Vigilantes no cumplieron con la norma pautada en *Pueblo v. Rivera Colón*, *supra*, por ello, carecían de motivos fundados para penetrar en una propiedad privada y obviar e ignorar la protección constitucional de los cazadores intervenidos. Es normal y completamente regular escuchar detonaciones en un área de caza y en plena temporada de la referida actividad recreativa. Esto no constituye motivo fundado para creer que se estuviera cometiendo un delito o violando alguna disposición estatutaria o reglamentaria de naturaleza administrativa en la finca rural propiedad del señor Raynier Ramírez en donde se escucharon tales detonaciones. Era completamente válida tal actividad recreativa por estar autorizada por ley y los reglamentos del DRNA.

Hay que tener presente que en *Pueblo v. Ferreira*, *supra*, la controversia versaba sobre la intervención en comercios o industrias estrechamente reglamentadas en las cuales se necesita una licencia para operar. Tal situación es diametralmente opuesta al caso ante nos, ello por encontrarnos frente a una actividad recreativa donde el cazador se somete a la jurisdicción del DRNA en cuanto a las leyes y reglamentos que regulan el deporte de la caza. En otras palabras, es una sumisión personal a la jurisdicción del DRNA en lo referente a las regulaciones

del deporte de la caza, la cual no comprende la sumisión de sus derechos y garantías constitucionales.

Los recurridos alegan que se vieron privados de un derecho constitucional fundamental como lo es la protección de las personas contra registros y allanamientos efectuados sin previa orden judicial. Reconocemos que existe una necesidad por parte del Estado de regular el deporte de la cacería pero hay diversas alternativas menos onerosas para cumplir cabalmente con las leyes y reglamentos que los Vigilantes administran, sin necesidad de violentar derechos constitucionales de los cazadores.

El DRNA, para justificar su intervención con los recurridos, alegó lo siguiente: (1) la licencia de cazador es un privilegio y no un derecho y que por tanto se puede intervenir libremente con los cazadores sin ningún tipo de limitación; (2) solo se puede cazar en propiedades privadas; (3) y que en el caso de autos, obtener una orden judicial previo al registro resultaba demasiado oneroso para los Vigilantes. Tales argumentos no nos convencen. Las licencias para conducir son también un privilegio y no por ello se ha desprovisto a los conductores de su derecho constitucional a la intimidad.

En Puerto Rico se permite la caza de aves acuáticas en la temporada determinada por el Secretario del DRNA en cuerpos de agua que son de dominio público. También, se permite la cacería de cabros y cerdos salvajes en Isla de Mona, que es un bien patrimonial del Estado pero en la actualidad se le da un uso público. Se permite, además, la

caza de caimanes y cocodrilos que son un peligro y amenaza para los seres humanos y especies nativas. Existen propiedades privadas las cuales podrían constituir un campo abierto, ya sean pertenecientes al Estado, o a personas jurídicas y/o naturales. La cacería bajo estas circunstancias podría producir un escenario de ausencia de expectativa razonable de intimidad de los participantes de dicha actividad deportiva.

Aceptar como válida la postura del DRNA respecto a la onerosidad de obtener una orden judicial, previo a la realización de un registro, en las circunstancias aquí presentes, sería el avalar **una actuación *ultra vires* de los Vigilantes, debido a que el DRNA no puede obviar o incumplir sus propios reglamentos.**[40] Máxime, cuando los requisitos para obtener una orden judicial para realizar un registro administrativo son mucho más laxos que en el área del derecho penal.[41]

VI

**El estatuto y el Reglamento que regulan el deporte de la caza, no autorizan la entrada en propiedad privada sin el consentimiento previo del dueño, sin previa orden judicial, o sin que se cumplan con los requisitos establecidos en la Sección 2191 de la LPAU, *supra*.** Los Vigilantes pudieron utilizar otros medios como por ejemplo, tratar de localizar al señor Raynier Ramírez dueño de la

---

[40] *P.S.P. v. Comisión Estatal de Elecciones*, 110 D.P.R. 400 (1980).

[41] *H.M.C.A. v. Contralor*, *supra*; *E.L.A. v. Coca Cola*, *supra*.

finca intervenida. Lo anterior, puede resultar sencillo, bastaría con preguntarle a vecinos, como el señor Fabre. Los Vigilantes pudieron esperar a que los cazadores terminaran de practicar el deporte e intervenir con ellos en un área permitida por el ordenamiento jurídico para ello. Disponían de los recursos necesarios, muestra de ello son los cuatro (4) vehículos de motor y la cantidad de Vigilantes que participaron en la intervención, lo que les hubiera permitido colocarse en la entrada o entradas de la finca del señor Raynier Ramírez e intervenir con los cazadores una vez estos salieran de la propiedad privada.

Nos reafirmamos en que no pretendemos limitar las facultades y poderes investigativos de los Vigilantes del DRNA para lograr hacer cumplir las leyes y reglamentos que estos administran. Lo que este Tribunal no va a permitir es que para lograr tal fin se infrinjan derechos tan fundamentales como lo es el derecho constitucional a la intimidad. El DRNA puede utilizar medios razonables para poder lograr el cumplimiento de las leyes y reglamentos bajo su jurisdicción.

Los procedimientos administrativos son muy variados y en algunos casos complejos, por ello no se pueden agrupar en un número reducido de moldes. Cierto es que las clasificaciones sencillas ejercen una atracción muy poderosa, ello por facilitar la determinación y aplicación del Derecho. Sin embargo, el logro de tal propósito no

puede hacerse a costa o riesgo de infringir derechos constitucionales de los individuos.[42]

## VII

Por los fundamentos expuestos se confirma la Sentencia emitida por el Tribunal de Apelaciones, la cual revoca la Resolución dictada por el DRNA y se devuelve el caso a la agencia para la continuación de los procedimientos a tenor con lo aquí pautado.

Efraín E. Rivera Pérez
Juez Asociado

---

[42] *E.L.A. v. Coca Cola*, *supra*.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

William Blassini  Cabassa, et als

      Recurridos

         v.

Departamento de Recursos Naturales y Ambientales

      Peticionario

CC-2007-1104

SENTENCIA

San Juan, Puerto Rico, a 7 de agosto de 2009.

Por los fundamentos antes expuestos se confirma la Sentencia emitida por el Tribunal de Apelaciones, la cual revoca la Resolución dictada por el DRNA y se devuelve el caso a la agencia para la continuación de los procedimientos a tenor con lo aquí pautado.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton emite Opinión de conformidad. La Jueza Asociada señora Fiol Matta  emite Opinión disidente a la cual se unió la Juez Asociada señora Rodriguez Rodriguez.


Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

William Blassini Cabassa,
et als

     Recurridos

     v.                          CC-2007-1104

Departamento de Recursos
Naturales y Ambientales

     Peticionario

Opinión de Conformidad emitida por el Juez Presidente SEÑOR HERNÁNDEZ DENTON

San Juan, Puerto Rico, a 7 de agosto de 2009.

Estamos conformes con el resultado al que llega el Tribunal en el día de hoy, al decretar la invalidez de un registro sin orden efectuado por el Cuerpo de Vigilantes en una finca privada, por ser contrario a la protección constitucional contra registros irrazonables. Los hechos particulares del caso de autos nos llevan a reafirmar la primacía del derecho de intimidad en nuestra jurisdicción, históricamente tutelado por este Tribunal. Reconocemos, sin embargo, la importante política pública de salvaguardar los recursos naturales, la cual no debe entenderse afectada por la decisión que tomamos en el día de hoy.

I.

El caso de autos requiere que evaluemos la validez de un registro sin orden efectuado por el Cuerpo de Vigilantes del Departamento de Recursos Naturales y Ambientales a unos ciudadanos que practicaban el deporte de la caza en una propiedad privada, a la cual los Vigilantes obtuvieron acceso mediante el consentimiento prestado por un tercero. Para ello, debemos resolver si la caza constituye un negocio estrechamente reglamentado que active la disposición de la Ley de Procedimiento Administrativo Uniforme que permite a las agencias, a modo de excepción, realizar registros sin orden al amparo de sus facultades de licenciamiento.

En atención a lo anterior, el recurso de epígrafe exige que examinemos la validez del registro en controversia en un contexto muy particular, que nos coloca en la delicada tarea de balancear dos intereses de rango constitucional: el derecho de la ciudadanía a no ser sometida a registros irrazonables y el deber gubernamental de conservar los recursos naturales.

La Constitución del Estado Libre Asociado de Puerto Rico consagró como política pública "la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad". Art. VI, Sec. 19, Const. E.L.A., L.P.R.A. Tomo 1. Esta disposición respondió a la clara intención de la Convención Constituyente de establecer la conservación del medio ambiente como una de las funciones primordiales de nuestro Gobierno. Misión Ind. P.R. v. J.C.A., 145 D.P.R. 908, 919 (1998). En atención a lo anterior, este Tribunal ha expresado que el referido precepto no es una declaración abstracta o exhortativa, sino un mandato constitucional que prevalece sobre cualquier ley, reglamento u ordenanza que sea

contraria a éste. *Íd.*; Paoli Méndez v. Rodríguez, 138 D.P.R. 449, 460 (1995).

A tono con dicho mandato constitucional, la Nueva Ley de Vida Silvestre de Puerto Rico, Ley Núm. 241 de 15 de agosto de 1999, 17 L.P.R.A. sec. 107 *et seq*, y la Ley de Vigilantes del Departamento de Recursos Naturales y Ambientales, Ley Núm. 1 de 29 de junio de 1977, 12 L.P.R.A. sec. 1201 *et seq*, establecen como política pública, respectivamente, la protección de la vida silvestre y su hábitat natural, así como la preservación y conservación de los recursos naturales de Puerto Rico. 12 L.P.R.A. secs. 107a y 1202.

Además de lo concerniente a las especies exóticas y la modificación de hábitats, la Ley de Vida Silvestre regula todo lo referente a la actividad de la caza en nuestro país. Específicamente, se regula la expedición, renovación y revocación de licencias de caza, la operación de cotos de caza, y el uso y la inscripción de armas de caza. 12 L.P.R.A. secs. 107c, 107d, 107i-107q, 107t. A esos efectos, la ley faculta al Secretario del D.R.N.A. para promulgar reglamentos relativos a las áreas donde estará permitido cazar en Puerto Rico, las temporadas de caza, la fauna silvestre que puede ser cazada, el número de animales de cada especie que pueden ser cazados por día y los procedimientos y costos de obtención de licencias y permisos, entre otros asuntos. 12 L.P.R.A. sec. 107g. Al amparo de esta delegación, se aprobó el Reglamento para Regir la Conservación y el Manejo de la Vida Silvestre, las Especies Exóticas y la Caza en el Estado Libre Asociado de Puerto Rico, Reglamento Núm. 6765 de 11 de febrero de 2004.

La referida ley prohíbe expresamente cazar especies de vida silvestre sin obtener una licencia previa del Secretario del D.R.N.A.   17 L.P.R.A. sec. 107c, 107j.   Para obtener dicha licencia, se requiere el cumplimiento de varios requisitos detallados en el estatuto. 17 L.P.R.A. sec. 107k.  Cabe señalar que como parte de dichos requisitos se exige que el solicitante mantenga un expediente negativo de antecedentes penales, así como haber aprobado un curso de educación para cazadores.  En el referido curso se incluye un examen sobre la Ley de Vida Silvestre, sus reglamentos, las destrezas de uso y manejo de armas de caza y el conocimiento de la vida silvestre. *Íd.*, inciso 3.

En la ley se enumeran los actos que, conforme a ésta, se consideran ilegales. 17 L.P.R.A. sec. 107d.  Es de notar que aunque la mayoría de las violaciones a la referida ley se consideran faltas administrativas, el estatuto establece que toda persona que viole sus disposiciones o sus reglamentos, incurrirá en delito menos grave, sujeto a las excepciones allí provistas. 12 L.P.R.A. sec. 107t, inciso 1. Véase, además, Reglamento Núm. 6765, Art. 9.02.  Asimismo, cazar en terrenos de dominio público o privado sin el consentimiento corroborable del dueño o encargado constituye, según la ley, un delito grave. 12 L.P.R.A. sec. 107t, inciso 1.

Por su parte, la Ley del Cuerpo de Vigilantes establece como uno de los deberes de los vigilantes velar por el cumplimiento de las leyes y reglamentos relacionados a la conservación y desarrollo de los recursos naturales. 12 L.P.R.A. sec. 1205,

inciso a, 8.[43] Véanse, además, 12 L.P.R.A. secs. 107s y 1202. Conforme a dicho deber, la ley le confiere al Cuerpo de Vigilantes amplias facultades, entre las cuales se encuentra inspeccionar y requerir la presentación de cualquier permiso o licencia otorgado por el Secretario del D.R.N.A. que acredite la autorización de cualquier actividad u operación bajo la jurisdicción y competencia del Departamento "en terrenos públicos **o privados** dentro de los límites del [E.L.A.]". (Énfasis suplido.) 12 L.P.R.A. sec. 1205, inciso b, 2. Esta facultad es cónsona con una de las obligaciones del cazador establecidas en la Ley de Vida Silvestre:

> Poseer y llevar consigo en todo momento que se transporte armas de caza o se dedique a la caza su licencia de caza o cualesquiera de las licencias o permisos autorizados, así como también certificado de registro del arma de caza y mostrar los mismos si así se le requiere a otro cazador, a un funcionario del orden público o a un funcionario del [D.R.N.A.] debidamente identificado. 12 L.P.R.A. sec. 107q.

La facultad de inspección de los Vigilantes también encuentra apoyo en el Reglamento Núm. 6765, *supra*, el cual establece que el Departamento podrá realizar "inspecciones rutinarias para asegurar el cumplimiento de las leyes, reglamentos y condiciones del permiso o licencia…". Artículo 8.08, inciso A, Reglamento Núm. 6765, *supra*.

La Ley del Cuerpo de Vigilantes también faculta a estos funcionarios del orden público a portar armas; ordenar verbalmente el cese inmediato de cualquier actividad bajo la

---

[43] La Ley también establece como uno de los deberes del Cuerpo de Vigilantes "[v]elar por la observancia estricta de las disposiciones de la Ley Núm. 70 del 30 de mayo de 1976 y sus reglamentos". 12 L.P.R.A. 1205, inciso a, 1. La referida Ley Núm. 70 es la anterior Ley de Vida Silvestre, derogada por la Ley Núm. 242, *supra*.

jurisdicción del Secretario llevada a cabo sin la autorización de éste o de forma irregular; emitir citaciones, expedir boletos, presentar denuncias y realizar **"todo tipo de intervención** por violaciones a las leyes administradas por el [D.R.N.A.]"; ejecutar *subpoenas* relacionados con dichas violaciones; ejecutar órdenes de arresto emitidas por los tribunales; y realizar arrestos cuando se cometieren delitos en su presencia. (Énfasis suplido). 12 L.P.R.A. sec. 1205, inciso b, 2. Asimismo, la referida ley preceptúa que el Cuerpo de Vigilantes puede ejecutar órdenes de registro y allanamiento **emitidas por los tribunales.** (Énfasis suplido). 12 L.P.R.A. sec. 1205, inciso b, 2.

Ciertamente, de las mencionadas disposiciones legales surge la facultad del Cuerpo de Vigilantes para intervenir con los cazadores. No obstante, dicha facultad está limitada por la propia Ley del Cuerpo de Vigilantes y, claro está, por las protecciones y garantías que nuestra Constitución le reconoce a los ciudadanos. Específicamente, la Ley del Cuerpo de Vigilantes dispone que éstos podrán "[r]ealizar registros relacionados con violaciones a las leyes cuya implementación ha sido encomendada al Departamento de Recursos Naturales y Ambientales, **conforme a las Reglas de Procedimiento Criminal de Puerto Rico**…". (Énfasis suplido). 12 L.P.R.A. sec. 1205, inciso b, 2, G. Es decir, la referida ley sujeta la facultad del Cuerpo de Vigilantes de realizar registros a que exista una orden emitida por un tribunal y que el registro se efectúe de acuerdo con las Reglas de Procedimiento Criminal. Conforme a ello, el Artículo 5 de dicha ley establece que "[l]a entrada a

propiedades privadas **requiere el permiso previo del dueño del terreno…**". (Énfasis suplido). 12 L.P.R.A. sec. 1205, inciso b, 1.

Ahora bien, dicho artículo contiene una excepción al disponer que los Vigilantes no necesitarán el permiso previo del dueño de la propiedad para entrar a la misma en los casos que establece la Sección 6.1 de la Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 de 12 de agosto de 1988, 3 L.P.R.A. sec. 2101 *et seq*. Como es sabido, dicha sección de la L.P.A.U. autoriza a las agencias a realizar inspecciones sin previa orden de registro o allanamiento en tres instancias, a saber: en casos de emergencia; al amparo de las facultades de conceder licencias o permisos; o en casos en que la información es obtenible a simple vista. 3 L.P.R.A. sec. 2191; Pueblo v. Ferreira Morales, 147 D.P.R. 238, 255 (1998); H.M.C.A. v. Contralor, 133 D.P.R. 945, 976 (1993).

## II.

Precisamente, en el caso de autos el D.R.N.A. aduce que el registro sin orden efectuado a los recurridos en una propiedad privada se llevó a cabo al amparo de su facultad de realizar inspecciones, su autoridad para conceder licencias para autorizar la práctica de la caza en nuestra jurisdicción y en la doctrina sentada en Pueblo v. Ferreira Morales, *supra*, sobre negocios o industrias estrechamente reglamentadas. Sin embargo, al igual que lo determinó el foro apelativo intermedio y según lo resuelve este Tribunal en el día de hoy, consideramos que dicha doctrina no es de aplicación al caso de autos.

De entrada, debemos señalar que en Pueblo v. Ferreira Morales, *supra*, reconocimos que aunque la Sección 6.1 de la L.P.A.U. no impone limitaciones a la actuación de las agencias, no hay duda de que la autorización conferida por dicha sección debe ser interpretada de forma consecuente con los parámetros mínimos de la Cuarta Enmienda de la Constitución federal y, más aún, con nuestros pronunciamientos bajo la Sección 10 del Artículo II de nuestra Constitución, la cual consagra la protección contra registros y allanamientos irrazonables. Pueblo v. Ferreira Morales, *supra*, pág. 255.

Por otro lado, la doctrina sobre negocios estrechamente reglamentados establecida en Ferreira, fundamentada en parte en la Sección 6.1 de la L.P.A.U., *supra*, se refiere exclusivamente a actividades comerciales, a industrias o a negocios. Ello se desprende del texto de la Opinión emitida en aquella ocasión, así como de sus fundamentos. Al acoger en nuestra jurisdicción la doctrina de negocio estrechamente reglamentado expusimos, entre otras cosas, que "bajo el Art. II, Sec. 10 de nuestra Constitución… los registros administrativos de negocios estrechamente regulados configuran una de las excepciones a la norma general esbozada en E.L.A. v. Coca Cola Bott. Co., [115 D.P.R. 197 (1984)] en cuanto al requisito de orden judicial". Pueblo v. Ferreira Morales, *supra*, pág. 254. Dicha expresión respondió a que en E.L.A. v. Coca Cola Bott. Co., *supra*, resolvimos que la garantía constitucional contra los registros irrazonables se extiende a los establecimientos comerciales y que dicha protección prevalecerá a menos que se consienta al registro, o que circunstancias de emergencia requieran lo

contrario y el balance de intereses en conflicto exija una solución distinta. E.L.A. v. Coca Cola Bott. Co., *supra*, pág. 208.

Como parte de los fundamentos expuestos en Ferreira para adoptar la doctrina del negocio estrechamente reglamentado, razonamos que las intervenciones administrativas en dichas industrias son consideradas menos nocivas a la intimidad que las intervenciones realizadas en negocios que no están bajo el constante examen de las autoridades. Se trata de circunstancias en las cuales la expectativa de intimidad se atenúa, pues, como expresamos en Ferreira:

> cuando una persona escoge involucrarse en un **negocio** cuya operación tiene tangencia con algún aspecto de la salud o seguridad pública y decide gestionar una licencia que autorice su participación en él, lo hace consciente de que los libros y expedientes del **negocio** así como los propios bienes objeto de la **actividad comercial** estarán sujetos a una inspección gubernamental muy intensa. El interés gubernamental en velar por el estricto cumplimiento de la reglamentación en el contexto de este tipo de **actividad comercial** cobra mayor significado frente al reclamo de intimidad personal. En tales circunstancias, resultaría oneroso y, por consiguiente, irrazonable obligar al Estado a que obtenga una orden judicial basada en causa probable para que pueda efectuar de forma válida un registro administrativo. De este modo, los intereses estatales postulados minimizan la expectativa de intimidad que la sociedad puede razonablemente reconocerle al **propietario del negocio**, y en consecuencia, bajo los parámetros de nuestra Carta de Derechos, resulta razonable la intervención y registro administrativo sin la previa obtención de una orden judicial. (Énfasis suplido). Pueblo v. Ferreira Morales, *supra*, págs. 254-255.

No cabe duda, por lo tanto, de que el *ratio decidendi* de Ferreira se basó en la existencia de una actividad comercial como punto de partida para la aplicación de la excepción de negocio estrechamente reglamentado. Además de acoger lo

resuelto por el Tribunal Supremo de Estados Unidos en New York v. Burger, 482 U.S. 691 (1987), que al igual que en Ferreira trataba sobre un negocio de depósito de chatarra, tomamos en consideración otras industrias o actividades comerciales en las cuales distintos tribunales de la jurisdicción estadounidense habían validado los registros administrativos sin orden, a saber: industria de minas de carbón, armas de fuego, bebidas alcohólicas, industria de farmacias, areneros y graveras, casas de empeño, industria de acarreo de bienes, negocio de disecado de animales, hogares de cuidado diurno, industria de seguros, entre otras. Pueblo v. Ferreira Morales, *supra*, pág. 252. Aun en el ámbito de las industrias o actividades comerciales hicimos la salvedad de que no toda actividad comercial que requiera la obtención de una licencia expedida por el Estado para que una persona pueda llevarla a cabo constituye una industria estrechamente reglamentada. Pueblo v. Ferreira Morales, *supra*, pág. 256. El requerimiento de una licencia, por sí solo, no es un factor determinante, pues la determinación de si una industria es estrechamente reglamentada deberá hacerse mediante un examen caso a caso. *Íd.*

Contrario a las actividades o industrias antes citadas, **practicar** la caza en una finca privada no constituye *per se* un negocio o industria estrechamente reglamentada. Distinto sería el caso si la finca en controversia fuese un coto de caza y no sólo una finca privada.[44] Aunque la Ley de Vida Silvestre

---

[44] Un coto de caza es una finca en la cual un cazador puede practicar el deporte a cambio de un pago al dueño o encargado de dicha finca. 12 L.P.R.A. sec. 107, inciso x. En el coto se provee al cazador los recursos necesarios para llevar a cabo el

establece un esquema detallado para la concesión de una licencia de caza y la violación de las disposiciones estatutarias y reglamentarias acarrea la imposición de sanciones civiles y penales, somos del criterio que ello no implica que dicha actividad se coloque dentro de la excepción de negocio estrechamente reglamentado. La Ley de Vida Silvestre define la caza deportiva como una "actividad recreativa autorizada por el Secretario en la cual el participante, llamado cazador deportivo, utiliza un arma para hacer presa a un animal de caza durante las temporadas establecidas por el Secretario". 12 L.P.R.A. sec. 107, inciso d. Esta actividad recreativa, por definición, está relacionada con la industria de las armas de fuego, la cual sí está estrechamente reglamentada. No obstante, ello no es suficiente para catalogar la caza como una industria de ese tipo. La aplicación de la doctrina de negocio estrechamente reglamentado activa una excepción a la norma general de requerir una orden judicial para garantizar la protección constitucional contra registros irrazonables. Por ello, dicha doctrina no debe aplicarse livianamente.

Lo anterior, sin embargo, de ninguna manera implica que con su proceder en el día de hoy este Tribunal avale la caza

_____

deporte, incluyendo las armas de fuego. 12 L.P.R.A. sec. 107e. Los requisitos para la operación de este tipo de establecimiento están contenidos en la Ley de Vida Silvestre y en el Reglamento Núm. 6765. *Íd.* Entre dichos requisitos se encuentra la presentación de un informe mensual al D.R.N.A. por parte del dueño o encargado del coto, en el cual se detalle la actividad de caza y otra información relacionada a las especies cazadas. *Íd.*, inciso f. A pesar de lo anterior, debemos señalar que del expediente ante nuestra consideración no surge que actualmente en Puerto Rico existan cotos de caza.

indiscriminada de nuestra fauna silvestre. Coincidimos con el criterio del Tribunal al expresar que practicar la caza conlleva una sumisión personal, en la cual el cazador se sujeta al cumplimiento de las disposiciones de la Ley de Vida Silvestre y a los reglamentos aplicables. Adviértase que, conforme a la política pública constitucional en pro de la conservación de nuestros recursos naturales, la caza está sujeta al cumplimiento de un esquema legal detallado respecto a: (1) los requisitos para obtener una licencia de cazador, lo que incluye, según hemos señalado, la aprobación de un curso de educación para cazadores que comprende un examen; (2) la fauna silvestre que puede ser cazada; (3) la temporada de caza; (4) el número de animales de cada especie que pueden ser cazados por día; (5) los lugares donde puede practicarse el deporte; y (6) las armas autorizadas para cazar, así como su inscripción, portación e inspección. De hecho, la Ley de Vida Silvestre preceptúa como una de las obligaciones del cazador que "[n]ingún cazador podrá matar o herir ningún animal de caza sin luego hacer un esfuerzo razonable para recobrarlo y tomar posesión del mismo para consumo, para taxidermia con fines educativos o de exhibición, en el caso de animales que puedan ser considerados como trofeos". 12 L.P.R.A. sec. 107q, inciso h.[45]

---

[45] Cabe señalar que el Manual del Estudiante del Programa de Educación a Cazadores del D.R.N.A. enfatiza la importancia del cumplimiento con el código de ética del cazador, lo que incluye seguir las reglas de la "buena caza", no aprovecharse injustamente de la fauna, aprovechar al máximo toda presa que obtenga y evitar el desperdicio de ésta. Véase, Manual del Estudiante del Programa de Educación de Cazadores del D.R.N.A. en http://www.drna.gobierno.pr/cazadores. Conforme a ello, se

III.

Luego de resolver que no aplica la excepción de negocio estrechamente reglamentado que permitiera a los Vigilantes realizar un registro sin orden judicial previa, nos resta evaluar si dicho registro se efectuó conforme a las Reglas de Procedimiento Criminal de Puerto Rico, según lo requiere la Ley del Cuerpo de Vigilantes, 12 L.P.R.A. sec. 1205, inciso b, 2, G, y a la garantía constitucional contra registros y allanamientos irrazonables. Coincidimos con la determinación del Tribunal a los efectos de que el registro en controversia es contrario a la referida protección constitucional.

A.

El Artículo II, Sección 10 de la Constitución del Estado Libre Asociado de Puerto Rico consagra el derecho de la ciudadanía a la protección de sus personas, casas, papeles, y efectos contra registros, incautaciones y allanamientos irrazonables. Art. II, Sec. 10, Const. E.L.A. P.R., L.P.R.A. Tomo 1. Esta sección, en unión a los principios constitucionales de la inviolabilidad de la dignidad del ser

---

dispone que "[e]l cazador responsable demuestra respeto por la pieza que ha cobrado", lo cual incluye cuidar la pieza para que la misma pueda consumirse y no se desperdicie. *Íd.*

Por otro lado, el Manual dedica un capítulo al tema de conservación y manejo de vida silvestre. En ese sentido, se explica que la caza ayuda a mantener las poblaciones de fauna silvestre en la capacidad de carga de su hábitat. El exceso de capacidad del número de animales cinegéticos en una población podría causar la muerte de los animales por inanición. Asimismo, la sobrepoblación de animales podría acarrear la destrucción de cultivos. Por ello, se considera que la caza es un instrumento de manejo para el control de dichas poblaciones. *Íd.*

humano y la protección de toda persona contra ataques abusivos a su honra, persigue proteger la intimidad de los ciudadanos frente a actuaciones arbitrarias del Estado. Art. II, Secs. 1 y 8, Const. E.L.A. P.R., *supra*; Pueblo v. Rivera Colón, 128 D.P.R. 672, 681 (1991). En términos prácticos, el objetivo de la referida Sección 10 del Artículo II de nuestra Constitución consiste en impedir que el Estado interfiera con la intimidad de las personas, salvo en aquellas instancias en las que el ordenamiento lo permite. Pueblo v. Yip Berríos, 142 D.P.R. 386, 397 (1997).

Como es sabido, la disposición constitucional contra registros irrazonables es análoga a la Cuarta Enmienda de la Constitución de los Estados Unidos. Sin embargo, como esta última cláusula sólo establece un ámbito mínimo de protección, los estados y Puerto Rico pueden reconocer a sus ciudadanos mayores garantías que las que confiere la Constitución federal. Lo anterior, junto a las dos salvaguardas adicionales que nuestra Constitución preceptúa sobre la inviolabilidad de la dignidad del ser humano y la prohibición contra ataques abusivos a la honra, reputación y vida privada de toda persona, nos han llevado a afirmar que en cuanto al derecho a la intimidad nuestra Constitución es de factura más ancha. Pueblo v. Yip Berríos, *supra*, págs. 397-398; E.L.A. v. Hermandad de Empleados, 104 D.P.R. 436, 439-440 (1975).

Conforme a la trascendencia y proyección del derecho de intimidad en nuestra jurisdicción, hemos resuelto que éste es "inherente al hombre y goza de primogenitura en nuestra descendencia constitucional". P.R. Tel. Co. v. Martínez, 114

D.P.R. 328, 338 (1983). Tan firme es el arraigo del derecho de intimidad en nuestro ordenamiento que, en ocasiones, éste ha prevalecido sobre otros derechos de similar jerarquía. *Íd.*, pág. 339. Por ello, este Foro no ha vacilado al expresarse sobre la naturaleza del derecho a la intimidad: "Incuestionablemente goza de primacía en la pirámide constitucional". *Íd.*, pág. 340.

La protección contra registros, incautaciones y allanamientos irrazonables del Artículo II, Sección 10 de nuestra Constitución se garantiza primordialmente mediante el requisito de una orden o mandamiento, expedido por una autoridad judicial, previo a intervenir con el ámbito privado de un individuo. Art. II, Sec. 10, Const. E.L.A. P.R., *supra*; Pueblo v. Rivera Colón, *supra*, pág. 681. Por ello, todo registro efectuado sin orden judicial previa se presume inválido.

Sin embargo, para que se active la referida protección constitucional es necesario que la persona intervenida tenga un derecho a abrigar, dentro de las circunstancias específicas del caso, una expectativa razonable de intimidad. Pueblo v. Yip Berríos, *supra*, pág. 398. Para determinar si existe tal expectativa, se requiere evaluar el lugar registrado; la naturaleza y grado de intrusión de la intervención; el objetivo de la intervención; si la conducta de la persona era indicativa de una expectativa subjetiva de intimidad; la existencia de barreras físicas que restrinjan la entrada al lugar registrado; la cantidad de personas que tienen acceso a dicho lugar; y las

inhibiciones sociales relacionadas con éste.  Pueblo v. Rivera Colón, *supra*, págs. 684-685.

Ante un reclamo de violación al derecho de intimidad, el criterio rector será si, a la luz de los factores mencionados, la persona alberga una expectativa razonable de intimidad.  Una vez se cumple con dicho requisito de umbral, debe evaluarse la razonabilidad de la intrusión gubernamental con la intimidad de la persona, lo que requiere balancear los intereses del Estado frente a los derechos individuales.  Pueblo v. Yip Berríos, *supra*, pág. 399.  En dicho análisis, es pertinente el "menor o mayor grado de expectativa a la intimidad que nuestro ordenamiento le reconoce a una persona en determinada circunstancia".  *Íd.*

De otra parte, es norma firmemente establecida que las investigaciones administrativas están sujetas a la referida garantía del Artículo II, Sección 10 de nuestra Constitución contra registros, allanamientos o incautaciones irrazonables.  E.L.A. v. Coca Cola Bott. Co., *supra*, pág. 205.  De ordinario, todo registro, ya sea de índole penal o administrativo, se presume inválido si se realiza sin orden judicial previa. *Íd.*, pág. 207.

Ahora bien, una de las excepciones a dicho principio constitucional es el registro consentido, el cual aplica cuando el consentimiento dado sea voluntario y prestado por quien tiene autoridad para ello. Pueblo v. Narváez Cruz, 121 D.P.R. 429, 436 (1988).  Conforme a lo anterior, hemos reconocido que un tercero que no es dueño de la propiedad a ser registrada puede prestar un consentimiento válido, siempre que tenga

alguna autoridad común u otra relación suficiente con dicha propiedad (doctrina de autoridad real). *Íd.*, pág. 437. Por ello, si la propiedad en cuestión está bajo la posesión exclusiva de otro, el consentimiento prestado por el tercero no es válido. *Íd.*

No obstante, no todo consentimiento prestado por quien no tiene autoridad real se considera inválido. De esta forma, el consentimiento se considera válido cuando el agente del orden público, actuando de buena fe, descansa en la autoridad que de forma razonable aparenta tener un tercero para consentir al registro (doctrina de autoridad aparente). *Íd.*, pág. 439. En estos casos, se requiere que el agente del orden público le pida a la persona que presta el consentimiento que se identifique y que dicho agente indague razonablemente respecto a la autoridad de la persona. *Íd.*, pág. 441. Debe tenerse presente, además, que cuando se invoca la doctrina de autoridad aparente deben observarse rigurosamente los requisitos de ésta. *Íd.*, pág. 443.

### B.

En el caso de autos, los recurridos se encontraban cazando en la finca privada del Sr. Raynier Ramírez, la cual estaba cerrada por una verja y excluía el acceso de terceros. No surge del expediente que el señor Ramírez hubiese concedido su autorización para que el Cuerpo de Vigilantes realizara intervenciones en su finca. Además, tampoco surge del expediente que los cazadores carecieran de la autorización del señor Ramírez para practicar el deporte en su propiedad, por lo que debemos partir de la premisa de que estaban debidamente

autorizados.  En estas circunstancias, los cazadores albergaban una expectativa razonable de intimidad.

Es cierto que la intervención de los Vigilantes con los cazadores que se encontraban en la finca privada respondió a que los agentes escucharon unas detonaciones de armas de fuego. Sin embargo, en las circunstancias particulares del caso de autos, ello no justifica la entrada a una finca privada sin contar con una orden judicial.  Adviértase que era temporada de caza y el área en donde se encontraban los Vigilantes era una autorizada para practicar el deporte. Ciertamente, en dichas circunstancias, la probabilidad de escuchar detonaciones de armas de caza en esa área incrementa, por lo que ello no constituye razón suficiente para justificar la intervención en controversia.

De otra parte, surge del expediente que los Vigilantes del D.R.N.A. obtuvieron acceso a la finca del señor Ramírez, en la que se encontraban los cazadores, mediante la autorización del Sr. Fabre, quien es dueño de una propiedad colindante.  El señor Fabre cortó la verja que marcaba la colindancia entre su finca y la del señor Ramírez.  Es tras ello que los Vigilantes pudieron intervenir con los recurridos.

No surge del expediente, sin embargo, que el señor Fabre estuviera a cargo de la finca del señor Ramírez ni que tuviese alguna relación con éste.  De hecho, según declaró uno de los Vigilantes durante la vista ante el oficial examinador, el señor Fabre cortó la verja porque no tenía llave del candado de ésta, ya que lo habían cambiado. Por lo tanto, es forzoso

concluir que el consentimiento prestado por el señor Fabre fue inválido, pues éste no tenía autoridad real para consentir.

Igual conclusión se impone en cuanto a la aplicación de la doctrina de autoridad aparente, pues del expediente ante nuestra consideración no surge que haya habido alguna manifestación o representación de parte del señor Fabre a los efectos de que poseía la autoridad para permitir el registro de la finca de su vecino. Del mismo modo, no hay prueba alguna de que los Vigilantes le hayan cuestionado al señor Fabre respecto a su autoridad ni de que hayan tenido información previa sobre ello. Por ende, consideramos que los Vigilantes no tenían elementos suficientes para creer, razonablemente, que el señor Fabre tenía la autoridad para consentir.

En vista de todo lo anterior, coincidimos con la determinación del Tribunal de decretar la invalidez del registro en controversia, efectuado en una propiedad privada sin orden judicial previa. El grado de intrusión del Estado en el caso de autos no puede justificarse con el interés de velar por el cumplimiento de la Ley de Vida Silvestre. Ante ello, el proceder del Tribunal le da vida al mandato constitucional que protege el derecho de intimidad de la ciudadanía y prohíbe intervenciones arbitrarias del Estado.

No obstante, estimamos importante señalar que la determinación a la cual llega este Tribunal en el día de hoy no implica que los Vigilantes estén impedidos de intervenir con los cazadores para implantar la rigurosa política pública a favor de la conservación de los recursos naturales consagrada en la Ley de Vida Silvestre. El curso de acción que toma el

Tribunal responde a las circunstancias particulares de una intervención realizada en una propiedad privada sin una orden judicial previa. Adviértase que el dueño de la finca de caza puede conceder una autorización previa al D.R.N.A. para que el Cuerpo de Vigilantes entre a su propiedad. En tales casos, la autorización conferida sería suficiente para que los Vigilantes entren a la propiedad y desempeñen su labor de implantar la política pública de la Ley de Vida Silvestre. Sin embargo, a falta de dicha autorización, y sin mediar alguna de las excepciones reconocidas, una intervención y registro sin orden en una finca privada infringe la fuerte protección del derecho de intimidad consagrado en nuestra Constitución. Por consiguiente, estamos conformes con la Opinión que emite el Tribunal en el caso de autos.


                                    Federico Hernández Denton
                                         Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


William Blassini Cabassa,
Roberto Matías Borreli y
Noel Matías Santiago
            Recurridos                        *CERTIORARI*

                              CC-2007-1104
            v.

Departamento   de   Recursos
Naturales y Ambientales
            Peticionario


Opinión Disidente emitida por la JUEZA ASOCIADA SEÑORA FIOL MATTA a la cual se une la JUEZ ASOCIADA SEÑORA RODRÍGUEZ RODRÍGUEZ


En San Juan, Puerto Rico, a 7 de agosto de 2009.

La decisión que hoy emite el Tribunal le niega a los vigilantes del Departamento de Recursos Naturales y Ambientales (DRNA) la facultad de penetrar en una finca privada, para asegurar que la actividad de cacería deportiva allí practicada cumpla con los requisitos impuestos por ley, sin antes obtener una orden judicial o tener motivos fundados de que se hayan violado las normas que regulan dicha actividad. Por el contrario, entiendo que la naturaleza de esta actividad y las circunstancias en que necesariamente se lleva a cabo, unido a su cualidad de ser altamente regulada, impiden considerar la actuación administrativa aquí impugnada como arbitraria e inconstitucional.

I

En cumplimiento con las directrices de sus supervisores de patrullar e inspeccionar las actividades de cacería durante la temporada de caza de palomas, los vigilantes Luis Vargas y Erick Valentín se encontraban patrullando en el Sector Rayo Plata del Barrio Encarnación del municipio de Lajas, un área donde se permite la caza deportiva, cuando escucharon varios disparos que provenían de la propiedad privada del señor Raynier Ramírez. Para llegar a dicha propiedad y cerciorarse del cumplimiento de los reglamentos que regulan la cacería, los vigilantes atravesaron la finca vecina con la autorización de su dueño, el señor Fabre. El señor Fabre les indicó que él había construido la verja que separaba su finca de la del vecino, por lo cual se haría responsable de los daños y cortó los alambres de la verja para darle acceso a los vigilantes a la finca del señor Ramírez, dónde continuaban las detonaciones.

Guiados por los disparos, los vigilantes siguieron un antiguo camino dentro de la finca del señor Ramírez hasta que encontraron dos vehículos estacionados. Continuaron la búsqueda y, a unos cincuenta pies, encontraron a una persona con una escopeta en la mano, mirando al cielo. En el suelo había maíz entero regado y, amarradas a un árbol por una cuerda de cuero, colgaban unas tórtolas. Continuando el camino encontraron al recurrido, Sr. William Blassini Cabassa, con quien regresaron al campamento para revisar los documentos pertinentes. Luego, los vigilantes

le expidieron tres multas administrativas al recurrido, por cazar doce tórtolas en exceso del máximo de quince permitido, cazar en área cebada y prestar su escopeta a una persona sin licencia de cazador.

Ante la agencia, los recurridos adujeron que los miembros del Cuerpo de Vigilantes llevaron a cabo un registro ilegal sin orden judicial previa, por lo que la prueba en la que se sustentaban las multas era inadmisible. El DRNA no acogió este planteamiento y resolvió lo contrario, fundamentándose en las facultades del Cuerpo de Vigilantes para llevar a cabo registros sin orden, a la luz de los propósitos de la Nueva Ley de Vida Silvestre.[46] El Tribunal de Apelaciones resolvió que no se probaron ninguna de las excepciones de la sección 6.1 de la Ley de Procedimiento Administrativo Uniforme (LPAU) que validan las inspecciones administrativas sin orden judicial previa. En particular, el foro apelativo concluyó que la cacería deportiva no es una actividad estrechamente regulada por el Estado, y que, en todo caso, dicha excepción está limitada a actividades comerciales. Por estos fundamentos, revocó la determinación del DRNA.

Ante esa determinación, el DRNA nos plantea la necesidad imperiosa de que los miembros del Cuerpo de Vigilantes puedan llevar a cabo registros administrativos

---

[46] Luego de examinar la evidencia admitida, el DRNA confirmó la validez de dos de los tres boletos expedidos. Por no haber suficiente prueba de que la escopeta fuera utilizada por aquella persona que no portaba licencia, ordenó la cancelación de dicha la multa.

para hacer valer la ley y las disposiciones del reglamento sobre la cacería. Sin embargo, este Tribunal rechaza el argumento válido del DRNA de que la cacería es una actividad altamente regulada, por lo cual le aplica la excepción del negocio estrechamente reglamentado, elaborada en Pueblo v. Ferreira Morales, 147 D.P.R. 238 (1998).

II

La Carta de Derechos de nuestra Constitución recoge los varios preceptos que componen nuestro concepto de derecho a la intimidad, en particular, las disposiciones sobre la inviolabilidad de la dignidad del ser humano, la protección contra ataques abusivos a la honra, a la reputación y a la vida privada o familiar, y sobre la protección contra registros, incautaciones y allanamientos irrazonables. 1 L.P.R.A. Const. E.L.A., Art. II, Secs. 1, 8, 10. Por tratarse de preceptos fundamentales, hemos resuelto que los registros administrativos o reglamentarios no están exentos de la norma general de que todo registro se presume irrazonable de no mediar una orden judicial previa. No obstante, el requisito de causa probable para expedir una orden de registro o allanamiento es menos estricto en el ámbito administrativo que el que hemos desarrollado para el ámbito penal. Véase, E.L.A. v. Coca Cola Bottling Co., 115 D.P.R. 197 (1984). Véanse además, See v. Seattle, 387 US 541 (1967); Cámara v. Municipal Court, 387 US 523 (1967).

La delegación del poder de investigación a las agencias administrativas es imprescindible para que dichos organismos puedan ejecutar o poner en práctica sus funciones y hacer efectiva la encomienda de fiscalización que se les confiere a través de las leyes que administran. En este sentido, hemos señalado que para efectuar un registro o allanamiento, la agencia debe obtener una orden judicial previa, "a menos que se consienta al registro, directa o indirectamente, o circunstancias de emergencia requieran lo contrario y el peso de los intereses en conflicto exija una solución distinta". E.L.A. v. Coca Cola, supra, pág. 208.[47] Esto cobra mayor fuerza si

---

[47] Antes de que resolviéramos ELA v. Coca Cola, el Tribunal Supremo de Estados Unidos había resuelto See v. Seattle, 387 US 541 (1967), y Cámara v. Municipal Court, 387 US 523 (1967), en los cuales requirió una orden previa para llevar a cabo un registro o inspección administrativa. Ambos casos reconocen la importancia de las inspecciones administrativas para hacer valer las normas de salud y sanidad y la diferencia de finalidades de los registros administrativos y los registros penales. Se reconoció que los estándares de causa probable en el ámbito penal son distintos en el ámbito administrativo y se satisfacen si se cumplen los requisitos legislativos y administrativos. Véase, D. Fernández Quiñones, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, Forum, pág. 228. El caso de Cámara v. Municipal Court, supra, trataba de un registro administrativo realizado a unas viviendas, al amparo del poder del estado de velar por el cumplimiento con los límites máximos de ocupación. El Tribunal Supremo federal resolvió que para examinar la validez de un registro administrativo sin una orden judicial previa se debe considerar si el registro sin orden judicial es necesario para la protección de un interés público significativo, que la intrusión sea mínima, que la finalidad del registro no sea descubrir la ocurrencia de un delito y que el requerir una orden de registro contrarrestaría y haría impráctica la protección del interés público que se persigue. Finalmente, resolvió que los hechos del caso no mostraban una urgencia particular que justificara el no requerir una orden judicial previa para inspeccionar el hogar. En See v. Seattle, supra, el

reconocemos que "[l]os procesos administrativos son demasiado variados y complejos para encajarlos en un número reducido de moldes". *Íd.*, pág. 214.

Según la LPAU, una agencia está facultada para llevar a cabo registros e inspecciones razonables, afines con el propósito de la licencia concedida, mientras actúe dentro del marco de sus funciones delegadas. A estos efectos, los registros sin orden judicial previa se entenderán razonables y válidos en tres circunstancias: (a) en casos de urgencias o cuando se vean afectadas la seguridad o la salud pública, (b) cuando se lleven a cabo **al amparo de las facultades de licenciamiento, concesión de franquicias, permisos u otras similares**" y (c) en casos en que la información requerida puede obtenerse a simple vista o en lugares públicos por mera observación. (Énfasis suplido.) Sec. 6.1 de la LPAU, Ley Núm. 170 de 12 de agosto de 1988, según enmendada. (3 L.P.R.A. sec. 2191.)

De lo anterior se pueden colegir dos excepciones a la regla general que están íntimamente relacionadas. En primer lugar, al solicitar un permiso o licencia para participar de una actividad particular, cuyo ejercicio se entienda como un privilegio y no un derecho, puede entenderse consentido el registro con fines administrativos. En esas circunstancias, se exime a la agencia de tener que procurar una orden judicial previa

---

Tribunal Supremo federal dejó la puerta abierta para resolver si al amparo de la facultad de licenciamiento se requeriría igualmente una orden previa para efectuar un registro administrativo. Íd.

para fiscalizar el uso debido de tal concesión. Pueblo v. Ferreira Morales, supra, pág. 255. Consecuentemente, con relación a las actividades cuyo ejercicio está sujeto a una reglamentación extensa y detallada, hemos dicho que las órdenes previas son innecesarias. Íd., págs. 254-255. También hemos resuelto, al igual que el Tribunal Supremo federal, que cuando se trata de actividades o de negocios estrechamente regulados, la expectativa de intimidad queda particularmente atenuada. Véanse: Pueblo v. Ferreira Morales, supra; New York v. Burger, 482 US 693 (1987); Donovan v. Dewey, 452 US 594 (1981).[48]

El Tribunal Supremo de Estados Unidos también ha reconocido la validez de aquellos registros sin orden previa que surjan en el contexto de un esquema regulador y en presencia de circunstancias apremiantes o necesidades especiales del estado que se quebrantarían, si se requiriera cumplir con el requisito de causa probable. La excepción denominada como "special needs doctrine" aplica cuando obtener una orden judicial previa sería

---

[48] Al estar sujeto al criterio de razonabilidad, hemos sostenido la validez de otros registros efectuados sin orden judicial o motivos fundados cuando éstos resultan razonables, en el balance de los intereses del estado y el derecho a la intimidad de las personas. Véase, Pueblo v. Yip Berríos, 142 D.P.R. 386 (1997); Pueblo v. Falú Martínez, 116 D.P.R. 828 (1986). Igualmente, y en sentido similar, hemos reconocido que la expectativa de intimidad es menor cuando el estado tiene un interés imperativo o ante circunstancias apremiantes que justifican prescindir del requisito de orden judicial previa, como sucede con respecto a los registros incidentales al arresto, los registros para preservar evidencia y registros tipo inventario. Véase, Pueblo v. Dolce, 105 D.P.R. 422 (1976); Pueblo v. González Rivera, 100 D.P.R. 651 (1972); Pueblo v. Rodríguez Rodríguez, 128 D.P.R. 438 (1991).

impracticable. Véase, Griffin v. Wisconsin, 483 US 868, 873 (1987), donde el Tribunal Supremo federal reiteró que los registros administrativos sin orden que se efectúan al amparo de un esquema altamente regulador de cierta actividad o industria, son válidos si cumplen con los estándares de razonabilidad, siguiendo la pauta de Camara v. Municipal Court, supra, New York v. Burger, supra, y Donovan v. Dewey, supra. En ese caso, se citan con aprobación las expresiones concurrentes del Juez Blackmun en New Jersey v. T.L.O., 496 US 325, 351 (1985): "…we have permitted exceptions when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable'." Luego, en Skinner v. Railway Labor Executives' Association, 489 US 602 (1989), el Tribunal Supremo federal, citando Griffin, se reafirmó en la aplicación de esta doctrina cuando el requerir una orden judicial previa atentaría contra las necesidades especiales del estado.[49]

---

[49] Siguiendo el razonamiento de Griffin, en Palmieri v. Lynch el Segundo Circuito rechazó los argumentos del demandante sobre violaciones a la protección constitucional federal contra registros irrazonables y de sus derechos propietarios bajo una reclamación estatal de *trespass*. El tribunal encontró que la intromisión fue *de minimis* y reconoció la validez de un registro sin orden realizada por una agencia de gobierno de protección ambiental sobre la base de los siguientes factores: (1) la naturaleza del reclamo de intimidad; (2) la naturaleza de la intromisión; y (3) la naturaleza de los intereses y necesidad del estado. 392 F.3d 73 (2004). Similarmente, hay jurisprudencia del estado de Illinois, que resuelve que la cacería es una industria estrechamente regulada utilizando un análisis de "special needs". Véase, People v. Layton, 552 N.E. 2d 1280, 1287 (1990).

A modo persuasivo, nos parecen acertadas las decisiones de los Tribunales Supremos de los estados de Montana y Minnesota, que reconocen las necesidades especiales del Estado para fiscalizar e implantar su política pública sobre la caza y pesca deportiva. En State of Montana v. Boyer, 42 P.3d 771 (2002), el Tribunal Supremo de dicho estado, reconociendo la naturaleza altamente regulada de la pesca, resolvió que la pesca recreativa es un privilegio que otorga el estado, y no un derecho, y razonó que quién practique tal deporte consciente a ciertas intromisiones del estado. El Tribunal concluyó lo siguiente:

> In complying with the well established license requirements, anglers acknowledge the prospect of at least some governmental intrusion into their activities. In engaging in this highly regulated activity, an angler must assume the burdens of the sport as well as its benefits. Thus, no objectively reasonable expectation of privacy exists when a wildlife enforcement officer checks hunting and fishing licenses in open season near game habitat, inquires about game in the field. In this capacity, game wardens are acting not only as law enforcement officers, but as public trustees protecting and conserving Montana's wildlife and habitat for all of its citizens. Íd., pág. 776.

Por otra parte, el Tribunal Supremo de Minnesota concluyó que en dicho estado existe un esquema de regulaciones dirigido a proteger la población de peces y, por consiguiente, la práctica del deporte de la pesca recreativa. Por ello, al igual el Tribunal Supremo de Montana razonó que las personas que solicitan una licencia para practicar este deporte, el cual es un privilegio y no

un derecho, aceptan las condiciones que el estado le impone y autorizan ciertas intromisiones. Con referencias a Boyer, el Tribunal atendió la naturaleza de la pesca recreativa y el hecho de que la inspección ocurrió durante la temporada de caza y en las cercanías del hábitat para concluir que la intervención del estado fue razonable y la intromisión, mínima. State of Minnesota v. Colosimo, 669 N.W.2d 1, 4-6 (2003).

Nos hemos referido, como lo hace la opinión mayoritaria, a nuestra Constitución, para matizar el alcance de la prohibición contra registros y allanamientos irrazonables. Hay otra disposición constitucional que también venimos obligados a considerar en el contexto de este caso, la sección 19 del Artículo VI que establece la política pública constitucional de conservación de nuestros recursos naturales para el beneficio del pueblo.

Es importante señalar que, al igual que Puerto Rico, los estados de Minnesota y Montana anuncian en su Constitución una política pública de conservación de sus recursos naturales. El estado de Montana recoge en su Constitución la política pública del estado de conservar y mejorar un ambiente limpio y saludable para las presentes y futuras generaciones. Art. IX, Sec.1(1) de la Constitución de Montana. Mont. Const. Art. IX, Sec. 1(1). Sobre la base de esta encomienda constitucional, el Tribunal Supremo de dicho estado reconoció en Boyer, supra, la facultad delegada a los agentes del departamento de protección

ambiental para proteger estos intereses y el propósito del esquema regulador que se impone sobre la práctica de la pesca recreativa. Por su parte, cuando el Tribunal Supremo de Minnesota atendió el caso de Colosimo, supra, el estado había enmendado recientemente su Constitución para reflejar la importancia de la cacería y de la pesca recreativa en su herencia cultural y, de esta manera, elevar a rango constitucional el deber de regular el uso de los recursos naturales.  Art. XII, Sec. 12 de la Constitución de Minnesota. Minn. Const. Art. XII, Sec. 12.

De esta forma, los más altos foros de estos estados, que han reconocido la validez de las intervenciones sin orden previa para asegurar los recursos naturales con miras a preservar la práctica de la pesca o de la caza recreativa, concluyen que en el contexto de las circunstancias particulares en que se dan estas actividades, el requisito de motivos fundados o de obtener una orden judicial previa truncaría la facultad del estado para hacer cumplir las normas que regulan detalladamente tales actividades.  Véanse, State of Montana v.  Boyer, supra, pág. 776 y State of Minnesota v. Colosimo, supra, pág. 7. Otros estados han llegado a la misma conclusión. Por ejemplo, en State of South Dakota v. Halverson, 277 N.W.2d 723, 724-725 (1979), el Tribunal Supremo de ese estado resolvió como sigue: "Since it is a privilege to hunt wild game, a hunter tacitly consents to the inspection of any game animal in his possession when he makes an

application for and receives a hunting license." También, People v. Layton, 552 N.E. 2d 1280, 1287 (1990): "In this State [Illinois], hunting is highly regulated, arguably more so than driving. Hunting is a privilege, not a right, to which licensing requirements apply. Because of the nature of hunting, we conclude that licensing (or hunting without a license) may be deemed consent to some intrusions." Véase, además, Drane v. State of Mississippi, 493 So.2d 294, 297 (1986).

En Pueblo v. Ferreira Morales, supra, resolvimos que cuando el interés gubernamental reglamentado es significativo o cuando existen circunstancias apremiantes, se presumen constitucionalmente razonables los registros administrativos sin orden previa o sin motivos fundados para asegurar el cumplimiento efectivo del esquema regulador, si este cumple ciertas condiciones. Íd., pág. 250, escolio 3. Las condiciones que debe cumplir el esquema regulador son las siguientes: debe estar fundamentado en un interés estatal sustancial, promover el interés del Estado y constituir un sustituto constitucional adecuado a la orden judicial, en cuanto a certeza y regularidad de la intervención. Íd., pág. 256. Finalmente, expresamos lo siguiente:

> De ordinario, una industria o actividad comercial es objeto de particular atención por el aparato estatal cuando la actividad realizada incide de manera significativa sobre la seguridad o salud pública. Éstas son áreas sobre las cuales el Estado posee un interés legítimo… Es preciso examinar la naturaleza de la industria en cuestión para determinar si su operación incide

sobre la seguridad y salud públicas. Así, sin pretender ser exhaustivos, resulta adecuado considerar si el estatuto establece un esquema detallado para la concesión de licencias de ser éstas requeridas, si la operación de la actividad está sujeta al cumplimiento de estrictas medidas seguridad y operación, y si la violación de las disposiciones estatutarias acarrea sanciones civiles y penales entre otros aspectos… Ninguno de estos factores es determinante y su examen debe realizarse integralmente para hacer un adecuado balance entre los intereses públicos y privados. Pueblo v. Ferreira Morales, supra, págs. 254, 256-257.

No hay duda de la alta jerarquía, incluso de índole constitucional, que tiene la política pública sobre la protección y conservación de nuestros recursos naturales y de que se trata de un interés legítimo y apremiante del Estado. Tampoco hay duda de que la cacería deportiva, que requiere el uso de armas de fuego o municiones de perdigón, es una actividad que incide sobre la seguridad pública. Atendiendo los criterios que elaboramos en Pueblo v. Ferreira, supra, y la naturaleza del interés apremiante del Estado de regular la actividad de la cacería en función de la debida protección de nuestros recursos naturales y de la salud y seguridad pública, no me parece que el ánimo de lucro sea determinante para extender esta normativa a una actividad, que sin ser una actividad comercial o un negocio, no deja de ser altamente regulada.

Por el contrario, considero que la caza deportiva es una actividad estrechamente regulada, dado que las leyes y los reglamentos aplicables a dicha actividad y a la protección de los recursos naturales construyen un esquema detallado de licencias y permisos en protección de ambos

intereses. Por tanto, la normativa adoptada en Pueblo v. Ferreira Morales, supra, rige también el ejercicio de la el Cuerpo de Vigilantes de su facultad de asegurar el cumplimiento de las leyes y los reglamentos aplicables a la cacería. Por eso es válida la intervención de los vigilantes en este caso, sin una orden judicial previa o motivos fundados. Examinemos algunas de las disposiciones que convierten la caza deportiva en una actividad estrechamente regulada.

III

Conforme a la declaración de política pública sobre la protección del hábitat natural y de la vida silvestre, la Nueva Ley de Vida Silvestre de 1999, supra, prohíbe la caza o colección de especies de vida silvestre en ausencia de un permiso emitido por el Secretario del DRNA. Ley Núm. 241 de 15 de agosto de 1999 (12 L.P.R.A. secs. 107a y 107c). Respecto a la reglamentación de la caza deportiva, la designación de hábitats y la adquisición de terrenos para reservas, la ley crea una Junta Asesora para aconsejar al Secretario del DRNA. 12 L.P.R.A. sec. 107b.

Esta ley define la caza deportiva como una "[a]ctividad recreativa autorizada por el Secretario [del DRNA] en la cual el participante, llamado cazador deportivo, utiliza un arma para hacer presa un animal de caza durante las temporadas establecidas por el Secretario". 12 L.P.R.A. sec. 107(d). Dicha actividad se distingue de la caza no deportiva, la cual es una

"[a]ctividad de caza para fines científicos, educativos, control de poblaciones o cualquiera otra actividad de caza no deportiva autorizada por el Secretario mediante permiso". 12 L.P.R.A. sec. 107(e).

La operación de las actividades de cacería, incluyendo el establecimiento de cotos de caza y los procedimientos relacionados con el registro, la portación y el uso de armas de caza, están sujetas a estrictas medidas de seguridad cuyo incumplimiento podría conllevar la revocación de los permisos y licencias otorgadas.[50] Véase,

---

[50] La Ley de Vida Silvestre enumera decenas de actos ilegales punibles relacionados a la caza, importación, exportación, posesión ilegal de especies, a la portación o transportación de armas de manera prohibida, a la modificación del hábitat natural. Específicamente, la ley detalla y penaliza los siguientes actos:

(a) Cazar deportivamente en Puerto Rico sin la correspondiente licencia de caza deportiva y sin el sello oficial de la temporada, cuando aplique.

(b) Cazar deportivamente cualquier especie de vida silvestre que no ha sido designada por el reglamento como animal de caza.

…

(f) Cazar deportivamente las especies de fauna silvestre designadas por el Secretario como animales de caza fuera de temporadas de caza establecidas. No será considerada ilegal, sin embargo, la caza de especies de vida silvestre para fines científicos y control de animales o educacionales por personas debidamente autorizadas para ello por el Secretario.

(g) Cazar deportivamente en los Bosques Estatales; cazar en los terrenos de dominio público administrados por el Departamento excepto en reservas de vida silvestre y aquellas reservas naturales donde el Secretario determine que la caza es una actividad compatible. El Secretario establecerá mediante reglamento los criterios para determinar los usos compatibles en las reservas naturales.

(h) Cazar deportivamente una cantidad de aves y animales en exceso a la máxima establecida por cada día de caza o en una etapa de vida o sexo

Art. 22 de la Nueva Ley de Vida Silvestre, supra, (12

L.P.R.A. sec. 107t); Art. 3.09 del Reglamento para regir la

_____

distinto a aquéllos establecidos por el Secretario para cada ejemplar de ave o animal de caza.

(i) Cazar o coleccionar cualquier especie de vida silvestre en un número mayor, en una etapa de vida o sexo distinto a aquéllos autorizados por el Secretario en los casos en que éste hubiere otorgado un permiso especial para caza o coleccionar con fine científicos y control de animales.

(j) Portar, transportar un arma o cazar con un arma que no esté registrada, según se establece más adelante…

(k) Portar o transportar cualquier arma de casa deportiva fuera de las temporadas de caza…

(l) Portar o transportar cualquier arma de caza en los terrenos de dominio público en los que se haya prohibido la caza, a menos que medie un permiso escrito del Secretario.

(ll) Establecer u operar cotos de caza sin haber obtenido un permiso del Secretario.

(m) Cazar en cotos de caza sin haber obtenido del Secretario la correspondiente licencia o permiso.

(n) Cazar en cotos de caza cualquiera de las especies de fauna silvestre que no haya sido designada por el Secretario como animales de caza mediante reglamento.

(ñ) Cazar deportivamente, cualquier especie de fauna silvestre en cualquier camino público o a una distancia menor de cien metros de las poblaciones y de las viviendas, a menos que la vivienda pertenezca al cazador o a una persona que le haya autorizado a cazar en el perímetro de cien metros.

(o) Cazar o coleccionar las especies vulnerables o en peligro de extinción…

…

(q) Cazar de cualquier forma que no sea la autorizada mediante reglamentación.

(u) Poseer, transportar, coger, coleccionar o destruir los individuos, nidos, huevos o crías de las especies de vida silvestre sin la previa autorización del Secretario…

(v) Cazar con cualquier arma que no sea autorizada…o mediante permiso otorgado por el Secretario o el utilizar municiones que estén prohibidas por reglamento. 12 L.P.R.A. sec. 107d.

conservación y el manejo de la vida silvestre, las especies exóticas y la caza en el Estado Libre Asociado de Puerto Rico, Reglamento Núm. 6765 de 11 de febrero de 2004, pág. 40.

Entre los propósitos del reglamento está el de "[r]eglamentar con mayor rigor el otorgamiento de licencias de caza, la inscripción de armas de caza y la revocación y suspensión de las mismas por infracciones expuestas en la ley y en este reglamento". Art. 1.03C del Reglamento Núm. 6765, supra, pág. 6. Las licencias de caza y otros permisos afines están condicionados a múltiples requisitos, así como el uso, almacenamiento, transportación, portación y tipo de armas permitidos para la cacería. Véanse, Arts. 3 y 4 del Reglamento Núm. 6765, supra, págs. 29-44.

En el reglamento se detallan los días en que se permitirá la caza de los distintos tipos de animales durante su temporada de caza y la cantidad máxima autorizada. El artículo 5.01 hace referencia al apéndice, en el cual se precisan los animales que se pueden cazar deportivamente y aclara que "aparte de los animales de caza aquí mencionados, se prohíbe cazar cualquier otro animal a menos que medie autorización expresa por el Secretario".[51] También se regulan los lugares para practicar esta actividad y se prohíbe la caza deportiva en los bosques estatales, en otras áreas relacionadas a los cuerpos de agua declarados como refugios de vida silvestre, las

---

[51] Se exceptúan los animales que el reglamento clasifica como animales dañinos. Reglamento Núm. 6765, supra, págs. 44-45.

poblaciones, residencias, caminos públicos, las reservas naturales donde la caza es incompatible con la conservación, así como en áreas cebadas. Art. 5.08 y 5.10 del Reglamento Núm. 6765, supra, pág. 48 y 53. La caza se permite sólo en los lugares no prohibidos, es decir, en fincas privadas con el consentimiento del dueño y en cotos de caza. Todo lo concerniente al establecimiento y la otorgación permisos para operar cotos de caza se reglamenta en el artículo 6. Véase Reglamento Núm. 6765, supra, págs. 54-59.

Además del tiempo y del lugar en los que se permite la práctica de esta actividad, el Reglamento para regir la conservación y el manejo de la vida silvestre, las especies exóticas y la caza en el Estado Libre Asociado de Puerto Rico establece una serie de restricciones especiales y muy específicas que atienden la forma y manera de cazar animales. Entre otras cosas, se prohíbe cazar animales con la ayuda de cebo y no se permite prestar las armas de caza a quien no sea cazador autorizado. Art. 19(d) de la Nueva Ley d Vida Silvestre, supra (12 L.P.R.A. sec 107q(d); Sec. 5.08, incisos A7 y H.[52]

---

[52] La sección 5.09, sobre las restricciones especiales, dispone lo siguiente:

A. Ninguna persona podrá cazar deportivamente las especies permitidas por este reglamento de la siguiente forma y manera:

1- Desde un escondite o "blind" instalado de manera permanente. El escondite tiene que ser movible y portátil y sólo podrá ser instalado en el periodo comprendido entre, dos horas antes del comienzo de la cacería hasta una hora luego de la

puesta del sol de ese mismo día. El mismo no debe interrumpir el libre flujo de las personas, vehículos o botes en el lugar de caza.

2- Con la ayuda y el uso de un automóvil u otro vehículo de motor o avión, a menos que el motor esté apagado y el movimiento progresivo haya cesado.

3- Con la ayuda y el uso de un bote de motor o velero, a menos que el motor esté apagado o las velas estén recogidas y el movimiento progresivo de las embarcaciones haya cesado.

4- Con el uso o ayuda de señuelos vivos, excepto aquellas personas a quien el Secretario le haya otorgado un permiso para la captura de exóticos o permiso especial para control de animales o investigación.

5- Con el uso de discos o grabaciones del llamado de las aves o sonidos de las mismas o el uso de amplificadores eléctricos imitando el llamado de éstas.

6- Mediante el uso de un vehículo de motor, bote de motor o bote de vela para conducir, perseguir o acorralar las aves, con el propósito de ponerlas a tiro del cazador.

7- Con la ayuda de cebo. El área se considera como que ha sido cebada, hasta 10 días después de haberse removido los alimentos.

8- De cualquier otra forma que no sea la autorizada por reglamento.

9- Sin el sello de caza correspondiente para la temporada.

B. Ninguna persona debe poseer por día en el área de caza o cuando regrese del área a su automóvil, campamento de caza o se dirija a su residencia un número de aves, cabros y/o cerdos mayor a los establecidos mediante edicto por el Secretario.

C. Ninguna persona podrá desplumar completamente un ave en el área de caza. Por lo menos, la cabeza y una de las alas, deben permanecer con todas sus plumas adheridas al ave, cuando sea transportada del área de caza a su residencia.

D. Ninguna persona podrá exportar o transferir especies de aves cazadas en Puerto Rico a menos que el embarque esté marcado en su exterior con (1) el nombre y dirección de la persona que envía las aves, (2) el nombre de la persona a quien se les envían, y (3) el número de cada una de las especies en el embarque.

E. Aquellas aves que sean heridas, deben ser sacrificadas de inmediato.

F. Ninguna persona podrá entregar, poner o dejar las aves cazadas en un lugar o bajo la custodia de otra persona a menos que las aves estén marcadas con una tarjeta con la siguiente información:

   1- La firma y dirección del cazador.

   2- El total de aves por especie.

   3- La fecha en que las aves fueron cazadas.

   4- Se requerirán marcas si las aves son transportadas por otra persona que no fuere el cazador o si las aves han sido dejadas para ser desplumadas o almacenadas (incluyendo almacenamiento temporal), enviadas o llevadas a un taxidermista.

G. Está prohibido la utilización de municiones de plomo para la caza de aves acuáticas. Durante la temporada de caza de aves acuáticas se utilizarán las municiones aprobadas por el Servicio Federal de Pesca y Vida Silvestre.

H. Ningún cazador deportivo prestará sus armas de caza excepto cuando se trate de otro cazador deportivo con licencia activa, en cuyo caso éste deberá acompañarlo en todo momento en que porte o transporte dicha arma o practique la cacería. Cuando un cazador preste su arma a otro cazador autorizado debe darle, por el periodo mientras éste esté utilizando el arma, la inscripción de la misma, para que pueda demostrar que es un arma legalmente inscrita. Ambos cazadores deben mantener contacto visual o auditivo.

… Reglamento para regir la conservación y el manejo de la vida silvestre, las especies exóticas y la caza en el Estado Libre Asociado de Puerto Rico, Reglamento Núm. 6765, págs. 49-52.

Para hacer valer la política pública de protección del hábitat natural y de la vida silvestre y salvaguardar los intereses gubernamentales de seguridad pública, la Nueva Ley de Vida Silvestre obliga a todo cazador debidamente autorizado a portar los permisos o licencias en todo momento en que se transporten armas de caza o se practique la caza y permitir su inspección de ser requerido por otro cazador, un funcionario del orden público o un funcionario del DRNA debidamente identificado. 12 L.P.R.A. sec. 107q(b). Además, el cazador deberá "[s]uministrar la información requerida por el Departamento con el propósito de monitorear las actividades de caza deportiva". 12 L.P.R.A. sec. 107q(h). A tono con la ley, el inciso I del artículo 5.09 del Reglamento para regir la conservación y el manejo de la vida silvestre, las especies exóticas y la caza en el Estado Libre Asociado de Puerto Rico dispone los límites de este registro administrativo:

> Todo cazador deportivo brindará información sobre la cantidad de animales que cazó, lugares que visitó, fechas de la captura o caza y cualquier otra información que se le requiera con propósitos de monitoreo sobre la cosecha de animales en Puerto Rico. Además, están obligados a presentar su licencia a los empleados del Departamento o funcionarios y agentes del orden público, **durante el desempeño de las funciones de éstos en el campo.** De igual manera tendrán que mostrar la inscripción del arma y su arma de manera que pueda ser corroborado su número de serie. (Énfasis nuestro.) Reglamento Núm. 6765, <u>supra</u>, pág. 52.

Además, dicho reglamento claramente dispone lo siguiente:

> **Todo cazador permitirá la inspección del producto diario de su caza y su licencia de caza deportiva a funcionarios (empleados) del**

**Departamento debidamente autorizados e identificados, funcionarios del orden público o un cazador autorizado.** Cualquier especie de fauna silvestre cazada en violación a este Reglamento, así como las armas, balas, cartuchos, municiones, arcos, flechas, cualquier embarcación, vehículo o cualquier aparato que haya sido utilizado en violación a este Reglamento podrán ser retenidas e incautadas por miembros del Departamento debidamente autorizados, miembros del **Cuerpo de Vigilantes** y/o de la Policía de Puerto Rico. (Énfasis suplido.) Art. 5.06B del Reglamento Núm. 6765, supra, pág. 47.

En otras ocasiones el reglamento anuncia el interés apremiante de hacer valer las disposiciones de la Nueva Ley de Vida Silvestre y avisa que:

Las actividades comerciales relacionadas con la posesión, reproducción, compra, venta, importación y exportación de vida silvestre reguladas por este reglamento están revestidas de un interés gubernamental sustancial por lo que el Departamento podrá, al amparo de sus facultades de licenciamiento y permisos, realizar inspecciones administrativas de sorpresa sin orden previa. Art. 7.06B del Reglamento Núm. 6765, supra, pág. 65.

El reglamento también avisa que el DRNA podrá realizar inspecciones rutinarias para asegurar el cumplimiento de las leyes, reglamentos y condiciones del permiso o licencia de las facilidades donde se mantengan las especies que haya autorizado poseer. Art. 8.08 del Reglamento Núm. 6765, supra, pág. 80.[53]

---

[53] Nos abstenemos de hacer referencia a la regulación de la cetrería para dilucidar la naturaleza de la reglamentación de la cacería debido a que no hay hechos en controversia que nos obliguen a aplicar dicha normativa. No obstante, a modo de ejemplo, véase, Ley de Cetrería del Estado Libre Asociado de Puerto Rico, Ley Núm. 137 de 25 de julio de 2000 (12 L.P.R.A. sec. 72, *et seq.*)

La Ley Núm. 1 de 29 de junio de 1977 que crea el Cuerpo de Vigilantes de Recursos Naturales y Ambientales dispone que los miembros del Cuerpo deberán velar por el cumplimiento de todas las leyes y los reglamentos relacionadas con la conservación, protección y el desarrollo de los recursos naturales de Puerto Rico. 12 L.P.R.A. sec. 1205(a)(8). Como parte de dicho deber, los miembros del Cuerpo de Vigilantes tienen la facultad, bajo la dirección del Secretario de DRNA, de inspeccionar y requerir la presentación de cualquier licencia o permiso expedido por el DRNA para realizar cualquier actividad bajo la jurisdicción de dicha agencia "en terrenos públicos o privados". 12 L.P.R.A. sec. 1205(b)(2)(A). Para poner en vigor los preceptos legales bajo su encomienda, el reglamento del Cuerpo de Vigilantes, además, faculta a los miembros del Cuerpo a penetrar propiedades privadas con permiso del dueño, excepto cuando estén persiguiendo a una persona por haber violado las leyes que administra el DRNA, las cuales tienen el deber de proteger.[54]

---

[54] Art. 5.2(A) del Reglamento del Cuerpo de Vigilantes del Departamento de Recursos Naturales y Ambientales, Reglamento Núm. 5855 de 11 de septiembre de 1998, pág. 15; Sec. 5.2(a) del Reglamento de Organización y Administración de los Recursos Humanos del Cuerpo de Vigilantes del Departamento de Recursos Naturales y Ambientales, Reglamento Núm. 7336, de 18 de abril de 2007, pág. 12. La ley, además hace mención específica a la sección 6.1 de la LPAU y de esta manera recoge las excepciones al requisito de orden previa para registros en propiedades privada. 12 L.P.R.A. sec. 1205(b)(1). Asimismo, el reglamento del Cuerpo de Vigilantes reitera esta autoridad. Véase, Art. 5.2(D)(1) del Reglamento Núm. 5855, supra, pág. 16. Véase además, Sec. 5.2(d)(1) del Reglamento Núm. 7336, supra, pág. 13.

IV

Resulta evidente que la cacería, a pesar de definirse como una actividad recreativa, está extensamente regulada por las leyes y los reglamentos aquí descritos, por lo que, según mi criterio, le aplica la excepción de actividad altamente regulada que elaboramos en Pueblo v. Ferreira Morales, supra. Además, el esquema regulador sirve a dos intereses gubernamentales de gran envergadura, a saber, la protección de los recursos naturales y la seguridad pública, y advierte a los que participan de esta actividad que estarán sujetos a fiscalización. Si dicho registro se lleva a cabo para fiscalizar el ejercicio de la actividad reglamentada y se mantiene la intervención dentro de los límites autorizados que le brindan certeza y regularidad al registro, éste será un registro válido y razonable.

Los miembros del Cuerpo de Vigilantes, aunque son agentes de orden público, ocupan un espacio especial en el ordenamiento. Sus funciones y, por ende, sus intervenciones con la ciudadanía no sólo se manifiestan en protección de los recursos naturales y de la vida silvestre, sino también para la seguridad de las poblaciones y de los mismos practicantes de la cacería. Por otro lado, el Estado tiene necesidades especiales al implantar su política pública sobre cacería deportiva. Primeramente, la práctica de este deporte se permite en pocos lugares públicos. Esto significa que para fiscalizar el cumplimiento, los vigilantes necesitan poder entrar a fincas privadas y cotos

de caza.   No hay otra forma de asegurarse de que un individuo está autorizado a cazar, que está cazando en un lugar autorizado y que se ha limitado a la cantidad de animales permitidos, si está practicando la cacería dentro de una finca privada.   Requerir una orden judicial en estas circunstancias  sería  muy  oneroso  y  prácticamente convertiría el ejercicio de fiscalización en una facultad en papel, pero inexistente o inútil en la práctica.   Por otro lado, el requisito de motivos fundados es igualmente elusivo.   La cacería no es ilegal *per se*.   Un vigilante puede escuchar disparos, pero ¿de qué manera podría deducir los motivos fundados para creer que se están incumpliendo las leyes y normas de la cacería?

En su informe, el oficial examinador del DRNA dejó en manifiesto lo impracticable que sería requerir una orden judicial previa, y similarmente los motivos fundados, para inspeccionar y fiscalizar las actividades de cacería. Concluye que:

> …sólo basta imaginar lo que tendían que hacer los Vigilantes antes de cada intervención por cada finca que fueran a intervenir durante cada día de trabajo: estarían obligados a localizar el dueño de cada finca donde se esté cazando para solicitarle su permiso para entrar; si el dueño no otorga el permiso o si no puede ser localizado, entonces deberían acudir a un tribunal para obtener una orden judicial de registro; luego deberán regresar a la finca donde es posible que ya no esté el cazador o los cazadores que pretendían intervenir.   No hay duda que la teoría del recurrente es incompatible con el interés del Estado y el esquema regulador de la caza ya discutidos.[55]

---

[55] Apéndice del recurso, pág. 80.

Es mi criterio que mientras una persona practica esta actividad altamente regulada, es decir, la cacería, su expectativa de intimidad se disminuye. Además, aunque los vigilantes intervinieron con el recurrido en una finca privada, no estamos ante una situación en que el estado haya penetrado la casa del recurrido o del dueño de la finca, donde sin duda se tendría una expectativa razonable más alta de intimidad. Por lo tanto, la naturaleza de esta intromisión pesa menos cuando se mide contra la necesidad del estado de regular esta actividad y la inmediatez con la cual se debe actuar, para cumplir con las facultades de fiscalización delegadas a la agencia, en circunstancias donde no es factible obtener una orden judicial previa ni exigir motivos fundados. Por estas razones, disiento.


Liana Fiol Matta
Jueza Asociada